IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

**No. 25-11147**

BILLY JOE HUNT

Appellant,

v.

COCHISE CONSULTANCY, INC., ET AL.

Appellees.

On Appeal from The United States District Court
for the Northern District of Alabama, Northeastern Division
Docket No. 5:13-cv-02168-LCB

**ORIGINAL BRIEF OF APPELLANT UNITED STATES OF AMERICA ex rel., BILLY JOE HUNT**

Earl N. "Trey" Mayfield, II
CHALMERS, ADAMS, BACKER & KAUFMAN, LLC
10524 Judicial Dr., 200
Fairfax, VA 22030
Tel: (703) 268-5600
tmayfield@chalmersadams.com

Larry A. Golston, Jr.
Leon Hampton, Jr.
Rebecca Gilliand
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
218 Commerce Street

Montgomery, Alabama 36104
Tel: (334) 269-2343
Larry.Golston@BeasleyAllen.com
Leon.Hampton@BeasleyAllen.com
Rebecca.Gilliand@BeasleyAllen.com


Gary V. Conchin
CONCHIN, COLE, JORDAN &SHERROD
2404 Commerce Court, S.W.
Huntsville, Alabama 35801
Tel:  (256) 705-777
gary@alainjurylaw.com

*Counsel for Appellant*

No. 25-11147
## APPELLANT BILLY JOE HUNT v. COCHISE CONSULTANCY, INC., ET AL.

### Certificate of Interested Persons and Corporate Disclosure Statement

The undersigned attorney of record for Appellant certifies, pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, that the following is a complete list of persons and entities with an interest in the outcome of this case:

1. Army Corps of Engineers

2. Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.

3. Carter, James M.

4. Chalmers, Adams, Backer & Kaufman, LLC

5. Cheng, Ronald L.

6. Cochise Consultancy, Inc. d/b/a Cochise Security

7. Cole, Kenneth Bridges, Jr.

8. Conchin, Gary V.

9. Conchin, Cole & Jordan

10. Daiker, Duane A.

11. Dyer, Aaron S.

12. Gilliland, Rebecca

13. Golston, Larry A., Jr.

14. Hampton, Leon, Jr.

i

15. Haynes, Jessica M.

16. Hunt, Billy Joe

17. Juris Day, PLLC

18. Loftin Holt, LLP

19. Loftin, G. Bartley, III

20. Mayfield, Earl N., III

21. Mayor, Derek M.

22. Miles, W. Daniel, III

23. The Parsons Corporation d/b/a Parsons Infrastructure & Technology

24. Pillsbury, Winthrop, Shaw, Pittman, LLP

25. Rizzo, Michael R.

26. Schaefer, Angela Marie

27. Shumaker, Loop & Kendrick, LLP

28. United States of America

29. Warchola, Robert

30. Wexler, Jeffrey David

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant Billy Joe Hunt requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a)(1) and Rule 28-1(c) of the Eleventh Circuit Rules.  Oral argument is warranted in this case because it raises important legal issues regarding the "government knowledge" defense and the applicability of the "unusual and compelling urgency" exception to the competitive bidding requirements for federal contracting set forth in 48 C.F.R § 6.302-2.

# TABLE OF CONTENTS

Certificate of Interested Persons.........................................................................i

Statement Regarding Oral Argument ................................................................ ii

Table of Authorities...........................................................................................1

Jurisdictional Statement.....................................................................................5

Statement of the Issues ......................................................................................5

Statement of the Case ........................................................................................7

    I.     Prior Proceedings & Dispositions.................................................7

    II.    Factual Statement...........................................................................9

          A. Background:   A Violent & Dangerous Iraq Requires Professional Security to Protect Convoys ...........................9

          B. The Cast of Characters ........................................................10

          C. Parsons Receives the CMC Contract from the Army Corps, Which Contract Requires Competitive Bidding for Subcontractors .................................................................12

          D. Parsons Seeks a Security Contractor to Protect Convoys ...12

          E. Army Corps Project Manager Wayne Shaw Intercedes to Have Parsons Allow Cochise to Bid on the Security Subcontract Despite Cochise Lacking a BOA.....................13

          F. Parsons Receives Bids on the Security Subcontract from ArmorGroup, Sabre & Cochise ..........................................14

G. Through the Competitive Bid Process, Parsons Evaluates the Three Proposals and Determines the ArmorGroup Proposal as "Cohesive and Best in Class" and as Meeting All Subcontract Requirements, While Cochise's Proposal Was "Minimal," Lacking Key Information, Unable to Provide All Required Equipment, and the Most Expensive Bid ...........................16

H. Army Corps. Project Manager Wayne Shaw & CO Hamilton Interfere in the Competitive Bid Process, Directing Parsons to Sole-Source the Security Subcontract to Cochise ...............18

I. Some Parsons Employees Internally Question the Hamilton Directive to Sole-Source the Security Subcontract to Cochise ...........................................................................19

J. Parsons Program Manager Hiles Raises the Hamilton Directive to the Army Corp, and the Directive is Rescinded ...........................................................................21

K. The Army Corps, by CO Jones, Tells Parsons It Can Decide to Whom the Security Subcontract Should Be Awarded, and, Without Any Discussion of the Factual Merits of the Bidders' Ability to Fulfill the Contract, that the February 18 Start Date Should be Met ..................................................................22

L. Parsons Sole-Sources the Security Subcontract to Cochise 24

M. Evidence Does Not Demonstrate an Urgent & Compelling Need to Sole-Source the Security Subcontract to Cochise, or to Award Cochise the Permanent Contract Instead of for the Limited Two-Week Period ..................................................27

N. Parsons' Sole-Source Selection of Cochise in Violation of Federal Competitive Contracting Requirements Cost the Government in Excess of ..................................................30

Summary of the Argument .........................................................34

Standard of Review......................................................................38

Argument ..................................................................................................38

I.    The District Court Erred in Appyling the Government Knowledge Defense to Parsons's Conduct, as the Evidence Does Not Unambiguously Demonstrate that Parsons Provided Complete, Accurate, Truthful, and Particularized Factual Information About the Capabilities of the Bidding Firms to Perform the Security Subcontract, Which Evidence Indicates that Parsons Provided Almost No Such Information, and Misled the Corp Into Believing that Only Cochise Could Perform the Contract ..................................................................................38

II.    Ample Evidence Exists Demonstrating as a Matter of Fact & Law That there was No Unusual & Compelling Urgency that Could Justify Parsons Sole-Sourcing the Security Subcontract to Cochise....................................................................................42

III.    The District Court Erred Dismissing Count III Because Parsons's Creation of Fraudulent Documents to Cover Up its Wrongdoing Are Capable of Influencing the Government's Payments to Parsons ..................................................................................48

IV.    The Amended Complaint & Evidence Are Sufficient to Demonstrate Defendants Unlawfully Avoided Competitively Bidding the Security Subcontract by Sole-Sourcing it to Cochise on Pretextual Rationales ........................................................51

V.    Count II Adequately Pleads Conspiracy Under § 3729(a)(1)(C), For Which Relator Provided Evidence in Conduct by Parsons & Cochise From Which a Jury Could Infer an FCA Conspiracy .53

Conclusion ...............................................................................................55

Certificate of Compliance.........................................................................56

Certificate of Service ...............................................................................57

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*United States ex rel. Hunt v. Cochise Consultancy*,
 887 F.3d 1081 (2018) ........................................................................................ 8

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
 587 U.S. 282 (2019) .......................................................................................... 8

*Georgia State Conference of NAACP v. Fayatte Cnty. Bd. Of Com'rs*
 775 F.3d 1336, 1343 (11th Cir 2015) ................................................................ 34

*Jarrard v. Sheriff of Polk Cnty,*
 115 F.4th 1306, 1315 n.9 (11th Cir. 2024) ........................................................ 38

*Urquilla-Diaz v. Kaplan Univ.,*
 780 F.3d 1039, 1045 (11th Cir. 2015) ............................................................... 39

*United States ex rel. Durcholz v. FKW Inc.,*
 189 F.3d 542, 545 (7th Cir. 1999) ..................................................................... 39

*United States v. Bollinger Shipyards, Inc.,*
 775 F.3d 255, 263 (2014) ................................................................................... 40

*United States ex rel. Butler v. Hughes Helicopter Corp.,*
 71 F.3d 321, 327 (9th Cir. 1995) ....................................................................... 40

*United States ex. rel. Ubl v. IIF Data Solutions,*
 650 F.3d 445, 453 (4th Cir. 2011) ..................................................................... 40

*United States ex rel. Kreindler & Kreindler v. United Tech. Corp.,*
 985 F.2d 1148, 1156 (2nd Cir. 1993) .................................................................. 40

*United States ex rel. Ladis v. Exelis, Inc.*,
   824 F.3d 16, 25 (2nd Cir. 2016)................................................................................ 40

*United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.,*
   400 F.3d 428, 455 n.21 (6th Cir. 2005) .................................................................. 40

*United States ex rel. Temple v. Sigmatech, Inc.*,
   2015 WL 1486986 at 6 (N.D. Ala March 30, 2015)............................................. 41

*United States ex rel. Burbaw v. Orenduff*,
   548 F. 3d 931, 953-54 (4th Cir. 2008).................................................................. 42

*AGMA Security Service, Inc. v. United States,*
   152 Fed.Cl. 706, 728-36 (2021)............................................................................ 44

*Supreme Foodservice GmbH v. United States,*
   109 Fed.Cl. 369, 389 (2013) ................................................................................. 45

*Cherokee Nations Tech., LLC v. United States*,
   116 Fed.Cl. 636, 640 (2014) ................................................................................. 45

*California Indust. Facilities Resources, Inc. v. United States*,
   100 Fed.Cl. 404, 410-11 (2011)............................................................................ 45

*Global Dynamics. LLC v. United States*
   137 Fed.Cl 772, 777 (2018) .................................................................................. 46

*McAfee, Inc. v. United States*,
   111 Fed.Cl. 696, 711 (2013) ................................................................................. 47

*Innovation Dev. Enters. of Am., Inc. v. United States*,
   108 Fed.Cl. 711 732-33 (2013)............................................................................. 47

2

*Per Aasleff A/S v. United States*,
  125 Fed.Cl. 147, 158 (2015) .................................................................. 47

*United States v. Triple Canopy, Inc.*,
  775 F.3d 628, 638-39 (4th Cir. 2015).................................................... 49

*United States ex rel. Feldman v. Van Gorp,.*,
  697 F.3d 78, 96 (2nd Cir. 2012)............................................................ 49

*United States ex rel. Garbe v. Kmart Corp.*,
  824 F.3d 632, 639 (7th Cir. 2016) ........................................................ 50

*Gose v. Native Am. Servs. Corp.*,
  109 F.4th 1247, 1318-19 (11th Cir. 2024).............................................. 52

*Marsterller for use and benefit of United States v. Tilton*,
  880 F.3d 1302, 1315-15 (11th Cir. 2018)............................................... 52

*United States ex rel. Longhi v. Lithium Power Technologies*
  575 F.3d 458, 466-72 (5th Cir. 2009).................................................... 52

*United States ex rel. Harrison v. Westinghouse Savannah River. Co.*,
  353 F.3d 908, 911, 913-17 (4th Cir. 2003)............................................ 53

*United States v. Hartley*,
  678 F.2d 961, 972 (11th Cir. 1982) ...................................................... 54

*Gilbrook v. City of Westminster*,
  177 F.3d 839, 857 (9th Cir. 1999) ........................................................ 54

*United States v. Murphy*,
  937 F.2d 1032, 1039 (6th Cir. 1991) .................................................... 54

## **Statutes**

28 U.S.C. § 1291 ................................................................................................ 5

31 U.S.C. § 3729(a)(1)(B) ................................................................................. 6

31 U.S.C. § 3729(a)(1) ...................................................................................... 6

31 U.S.C. § 3729(a)(1)(A) ................................................................................. 6

31 U.S.C. § 3729(a)(2) ...................................................................................... 6

31 U.S.C. § 3729(a)(1)(C) ................................................................................. 7

31 U.S.C. § 3731(b)(2) ...................................................................................... 8

10 U.S.C. § 3204(a)(2) .................................................................................... 43

41 U.S.C. § 3304(a)(2) .................................................................................... 43

## **Rules**

48 C.F.R. 52.244-5, DEC 1996 ...................................................................... 12

Fed. R. Civ. P. 56(a) ....................................................................................... 34

48 C.F.R. § 6.302-2 ........................................................................................ 43

## JURISDICTIONAL STATEMENT

The district court entered a Final Order on March 19, 2025, granting summary on all counts of the Amended Complaint to both Defendants, and dismissing the action with prejudice. [Doc. 279]. This Court has appellate jurisdiction over Relator Hunt's appeal of the Final Order under 28 U.S.C. § 1291. Pursuant to FRAP 4(a)(1), Hunt timely appealed from the district court's Final Order on April 8, 2025. [Doc. 280].

## STATEMENT OF THE ISSUES

Relator Hunt's case concerns the unlawful evasion of federal requirements that prime contractors competitively bid subcontracts, in which the prime contractor illegally sole-sourced the contract to a preferred firm, causing the Government to incur millions of dollars in unnecessary expense. The District Court's grant of summary judgment against Relator's claims raises the following substantive questions in this appeal:

1. Whether the District Court erred in granting summary judgment on the basis of the "government knowledge" defense, where the evidence does not unequivocally demonstrate the Defendant contractor completely, truthfully, and with particularity informed the Government of the facts underlying its request to sole-source the contract to give the Government

full knowledge for the requested approval, and there is evidence that the Defendant contractor provided the Government with false, misleading, and incomplete information to justify its avoidance of competitive bidding requirements?

2. Whether the District Court erred in granting summary judgment on the basis of the Defendant contractor's claim of an unusual and compelling urgency to deviate from the federal requirement of competitive bidding on subcontracts, when there is evidence demonstrating that the contractor lacked the factual and legal basis for invoking that urgency?

3. Whether the District Court erred in granting summary judgment against a fraudulent records claim under § 31 U.S.C. 3729(a)(1)(B), where the documents were created to cover up a contractor's wrongdoing after it fraudulently obtained the Government's approval of a sole-source subcontractor, and the documents were capable of influencing the Government's decision to pay the contractor even if the Government did not actually review the documents?

4. Whether the District Court erred in granting summary judgment against a express/implied certification and fraudulent inducement claims under 31 U.S.C. §3729 (a)(1), §3729(a)(1)(A), and § 3729(a)(2) where there is evidence that a prime contractor fraudulent sole-sourced a subcontract in

violation of requirements in the prime contract and federal law that the subcontract be competitively bid?

5. Whether the District Court erred in granting summary judgment against an FCA conspiracy claim under 31 U.S.C. § 3729(a)(1)(C), where the complaint details the who, what, how, when, and where of the underlying FCA fraud by the Defendants, and there is evidence demonstrating that fraud from which a jury could infer that the Defendants acted in concert?

## STATEMENT OF THE CASE

### I.    PRIOR PROCEEDINGS & DISPOSITIONS

This appeal is brought by *qui tam* Relator Billy Hunt under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"). The action arises out of conduct during the Iraq War in 2006 by Defendant The Parsons Corporation ("Parsons"), which was awarded a prime contract by the U.S. Army Corps of Engineers ("USACOE" or "Corps") to remove, transport, and dispose of the vast quantities of munitions left behind by Iraqi forces. Under the perilous wartime conditions, the convoys required to carry out that mission needed professional security. Parsons awarded a Security Subcontract to Defendant Cochise Consultancy, Inc. ("Cochise") as a sole-source bid, instead of under a competitive bidding process as required under the prime contract and by federal law. Hunt's Amended Complaint alleges that Parsons made that sole-source award fraudulently, and that it should have gone to a much less

expensive and far more qualified firm, ArmorGroup, that had actually won the competitive bidding process before Parsons diverted the Subcontract to Cochise. Hunt alleges Parsons and Cochise thereby violated the FCA, causing the Government to incur millions of dollars in unnecessary expenditures. The District Court granted summary judgment against all five counts of the Amended Complaint. Hunt appeals the court's ruling as to Counts II, III, and IV.

Relator Hunt filed his original Complaint under seal on November 27, 2013, in the Northern District of Alabama. [Doc. 1]. The United States declined to intervene on January 29, 2015 [Doc. 9], and the Complaint was unsealed. [Doc. 10] The district court dismissed the case on April 28, 2016, holding it time-barred under 31 U.S.C. § 3731(b)(2). [Docs. 63 & 64]. This Court reversed, holding that Hunt's Complaint was timely, creating a three-way circuit split on Section 3731(b)(2)'s proper construction. *United States ex rel. Hunt v. Cochise Consultancy*, 887 F.3d 1081 (2018). The Supreme Court then affirmed this Court's interpretation of Section 3731(b)(2) and remanded the case to this Court for further proceedings. *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 282 (2019).

This Court remanded the case to the District Court, and Hunt filed an Amended Complaint on January 27, 2021. [Doc. 118]. Both Defendants moved for summary judgment on December 21, 2022 [Docs. 213 and 220], which the District

Court granted by an Opinion and Final Order on March 19, 2025. [Docs. 278 & 279].

Relator Hunt timely filed his notice of appeal on April 8, 2025. [Doc. 280].

## II.    FACTUAL STATEMENT

### A. Background: A Violent & Dangerous Iraq Requires Professional Security to Protect Convoys.

In late 2005 and early 2006, Iraq was a violent place, with U.S. service members and Government contractors there regularly under attack. [Doc. 221-14 at p. 10 (Hamilton Depo., 30:22-31:3)]. Weapons and ammunition dumps dotted the countryside, accessible by almost anyone. The munitions (such as bullets, pyrotechnics, and artillery shells) were not sealed, were subject to leaking, corrosion, and incomplete detonation, and could be used as booby traps (like IEDs), posing tremendous danger to personnel. These munitions were known as Class V materials. The Coalition Munitions Clearance ("CMC") project was created to remove, transport, and dispose of these munitions. The convoys required to carry out the CMC mission, as well as other convoys for purposes like logistics and personnel transport, required security.  [Doc. 233-8 at p. 17 (Linsmier Depo., 59:7-14-63:23)]. Without professional security, conducting convoys under those conditions in Iraq would have been suicidal. [Doc. 233-8 at p. 33 (Linsmier Depo., 125:13-126:6)].

**B. The Cast of Characters.**

**<u>Parsons</u>**

Adrian Quick: Contract Specialist employed by Parsons employee who employed as Mr. Runnels' assistant and reported to him.  [See Doc. 221-28 at p.4 and  Doc. 118 at p.12, ¶30]

Billy Hunt: Deputy Program Manager for Parsons, reporting directly to Gaines Newell. [Doc. 221-28 at p. 2]

Dwight Hill:. Subcontract Manager and Property manager for Parsons, and reported to Hoytt Runnels.  Sent out recompete RFP requesting response by February 10, 2006  Also executed the February 21, 2006 contract naming Cochise security services subcontractor. [Doc. 221-62 at p.12 (Hill Depo. 39:1-22) and See Doc. 221-28 at p.4]

Glenn McLea: Head of Security  for Parsons in the Middle East [Doc. 221-19 at p.22 (Billy Hunt Depo. 80:19-81:3)].

Guy Irvin: Country Security Manager for Iraq.  Duties included supervising vendors and ensuring contractors were up to task; managed subcontractors.  [Doc. 231-1 at pp.16-17 (Irvin Depo., 55:16-20) and 57:2-10

Hoytt Runnels: Procurement Manager for the CMC Project.  Reported to Tal Brannan.  Oversaw buyers, contracting personnel, and purchase orders.  In charge of evaluating and selecting the security convoy subcontractor for the Security Contract. [Doc. 233-2 at p.15 (Runnels Depo., 49:5-53:20; 56:19-61:23)].

Tim Hiles: Project Manager /Program Manager / Vice President for Parsons located in Huntsville, AL.  As Project manager Hiles oversaw the development, scope of work, and technical review of received proposals,

and assure quality control execution over the contract. [Doc. 221-5, at pp. 15-16 (Hiles Depo., 50:16-51:22 and Hiles Depo., 55:13-23)]

Gaines Newell: Program Manager for Parsons Coalition Munitions Clearance project. [See Doc. 118 at p.13, ¶33; see also Doc. 221-46 at p.8 (Shaw Depo., 111:21-112:1)]

## Army Corps of Engineers

Steve Hamilton: USACOE Contract Officer ("KO") for the Parsons Prime Contract. A KO is responsible for entering into, administering, or terminating contracts on behalf of the United States Government. [See Doc. 118 at p.11, ¶26]

Wayne Shaw: Project Manager for the USACE. Reported to Steve Hamilton.  Shaw's job included monitoring site progress.  [See Doc. 118 at p.11, ¶25]

Cheryl Jones: Contracting Officer for USACOE [Doc. 221-17 at p. 13 (Tadesse Depo., 43:9-17)].

Lydia Tadese: Supervisory Contract Specialist / former Huntsville, AL Branch Chief and Cherly Jones' supervisor in Huntsville. [Doc. 221-17 at p. 10 (Tadesse Depo., 30:3-32:11) and Doc. 221-17 at p. 13 (Tadesse Depo., 43:9-17)].

## Cochise

Jesse Johnson: President and owner of Cochise. [Doc. 221-26 at p.8]

Steven Scales: Cochise's Site Manager and Head of Operational Recruiting, reported to Jesse Johnson. [Doc. 221-27 at p. 9 (Scales Depo., 26:10- 27:10, 35:12-16.)]

Robert Brooks: Company Operations Officer for Cochise. [Doc. 216-33 at p. 36 (Brooks Depo., 135:7-13)}

**<u>ArmorGroup</u>**

Robert Linsmier: Former ArmorGroup employee who is a security expert, and who helped to write the ArmorGroup proposals for the Security Subcontract. Robert Linsmier was ArmorGroup's Business Development Director in Iraq and participated in the preparation and submission of ArmorGroup's bid on the Security Contract, along with Jon Knight, Jonathan Ryan, and David Wilson. [Doc. 233-8 at p. 6 (Linsmier Dep., 15:23-16:5; 35:16-20; 45:22-46:19; 48:5-49:18; 52:19-53:14; 66:9-14; 265:6-11)].

## C. Parsons Receives the CMC Contract from the Army Corps, Which Contract Requires Competitive Bidding for Subcontractors.

On September 30, 2004, USACE awarded Parsons contract No. W912DY-04-D- 0005 – referred to as the Coalition Munitions Clearance Project or the CMC Contract – for the cleanup of excess munitions left behind by retreating or defeated enemy forces. [Doc. 233-5] The CMC Contract adopted the federal regulations requiring competitive bidding in subcontracting (48 CFR 52.244-5 DEC 1996), which -provides, "(a) The Contractor shall select subcontractors (including suppliers) on a competitive basis to the maximum practical extent consistent with the objectives and requirements of the contract." [.Doc. 233-5 at p. 66.]

## D. Parsons Seeks a Security Contractor to Protect Convoys.

On January 27, 2006, USACE funded Task Order 10 under the CMC Contract which required Parsons to hire a subcontractor to provide Class V security (logistical convoys transporting explosives and ordnances) and Personnel Security Detail

("PSD") services (protection of people, including both USACE officials and Parsons employees, as they moved between sites outside of established U.S. military bases in Iraq) and the operation of a "reception facility in Kuwait[.]" (the "Security Subcontract"). [Doc. 221-24] [Doc. 221-25 at p. 24, (Irvin Depo., 85:14-23)] [Doc. 221-19 at p.1, (Hiles Depo., 280:17-20)].

On January 18, 2006, Parsons issued a RFQ for the provision of Class V and PSD security services to companies with which it had a Basic Ordering Agreement ("BOA"), including Sabre International Security ("Sabre") and ArmorGroup, but not Cochise, because Cochise lacked a BOA. [Doc. 221-32 and Doc. 221-33]. The RFQ's "Security Team Requirement" was a "Minimum of 42 personnel to be active an available for missions, 24 hours a day, 7 days a week." [Doc. 221-32 at p.8]

### E. Army Corps Project Manager Wayne Shaw Intercedes to Have Parsons Allow Cochise Bid on the Security Subcontract Despite Cochise Lacking a BOA.

On January 24, 2006, Jesse Johnson contacted Parsons on behalf of Cochise seeking to enter a BOA with Parsons. [Doc. 221-77]. After complaining to Shaw, Cochise was allowed to bid at Shaw's insistence and direction. [Doc. 216-23 at p. 38 (Hunt Depo., 145:17-146:4)]. Shaw did so even though Cochise had not provided the required documentation that would have enabled Cochise to be included in the BOA. [Doc. 221-2 and Doc. 216-13]; [Doc. 231-1 at p. 29 (Irvin

Depo., 107:9-16; 234:22-235:5; 236:17-20)].

On January 25, 2006, Guy Irvin, Country Security Manager for Parsons in Iraq, approved of Cochise's technical capabilities and found the company acceptable for inclusion under a Parsons BOA. [Doc 221-26]. On February 2, 2006, Irvin followed up with Dwight Hill, Parsons Senior Subcontract Administrator, to check on the progress of that BOA. *Id.* At USACE's direction, Parsons issued a new RFQ on February 8, 2006 to six potential offerors, including Cochise, with a bid deadline of February 10, 2006. [Doc. 221-34].

**F. Parsons Receives Bids on the Security Subcontract from ArmorGroup, Sabre, & Cochise.**

Parsons received timely bids from ArmorGroup, Sabre, and Cochise. [Doc. 221-35]. ArmorGroup's 58-page proposal stated that it would take 26 days from the date of award to train and mobilize its personnel and included a "Mobilisation" table reflecting the timeline that would begin when the award was made. [Doc. 221-3 at p. 18]. At all times, ArmorGroup had adequate personnel to staff the contract by the February 18, 2006, start date. [Doc. 233-8 at p. 24 (Linsmier Depo., 87:22-88:13; 90:11-15; 126:6-20; 131:12-132:9)]. In fact, ArmorGroup was prepared to fully staff the contract two days earlier, February 16. [Doc. 233-8 at p. 35 (Linsmier Depo., 132:10-134:15; 214:20-215-20; 215:3-1)]. As Linsmier explained, "We had the luxury of having basically a couple of stand-by pools. There were always some additional personnel at the main villa, which is where all the

expats lived. We also had a depo in Kuwait where we had replacement vehicles and backup supplies and backup repair parts; and we always had a surplus of personnel there ready to backfill in case of injuries, casualties and leave rotations." [Doc. 233-8 at p. 24 (Linsmier Depo., 88:18-89:5)]. At any point in time, Armor Group had between 375 and 450 expats in Iraq. [Doc. 233-8 at p. 24 (Linsmier Depo., 89:18-90:15)]. Armor Group had the personnel and equipment immediately available, "earmarked and ready to go" for the Parsons subcontract. [Doc. 233-8 at p. 25 (Linsmier Depo., 91:11-20; 136:4-137:2; 140:2-14; 230:13-231:22; 232:10-18; 232:17-234:11; 253:11-21; 254:12-14; 300:16-301:3)]

ArmorGroup manager David Wilson told Guy Irvin at Parsons there was no issue with the 26 days to fully deploy stated in ArmorGroup's original proposal, and that, in fact, it was ready to deploy to fulfill the subcontract immediately. [Doc. 233-8 at p. 26 (Linsmier Depo., 96:7-97:2; 133:1-12; 136:16-137:2; 215:21-216-5)]. Indeed, ArmorGroup's bid proposal explicitly recognized, "Currently, the expected start date is 18 February 2006 however AGI understands that this may be brought forward." [Doc. 221-3].

Cochise's two-page email proposal stated that Cochise "will provide the required and highly qualified personnel to fulfill the security services and other directed activities to support Parsons and the Corps of Engineers with Class V and PSD security services [.]  . . . [Cochise has] 26 personnel currently in country and it

15

is assumed that those personnel will remain in country and will be immediately ready to assume the mission." [Doc. 221-2].

### G. Through the Competitive Bid Process, Parsons Evaluates the Three Proposals and Determines the ArmorGroup Proposal as "Cohesive and Best in Class" and as Meeting All Subcontract Requirements, While Cochise's Proposal Was "Minimal," Lacking Key Information, Unable to Provide All Required Equipment, and the Most Expensive Bid.

On February 11, 2006, Parsons Procurement Manager Runnels issued a "Preliminary Evaluation of Proposals" memorandum, the key document in this case, in which he concluded that the "proposal from ArmorGroup represents a cohesive and best in class proposal, and represents the best value for the government in performance of the assigned missions" and selected "Armor Group for the provision of convoy, Class V and PSD security[.]" [Doc. 221-35 at p. 6] The Evaluation made numerous essential determinations about the respective abilities of ArmorGroup and Cochise to fulfill the Subcontract, including:

- ArmorGroup provided a [58-page] "thoroughly professional proposal" supplying all required documentation, while Cochise's two-page proposal was "minimal," containing only labor costs.

- Cochise was not an approved security service provider with Parsons, and it was unknown if Cochise could comply with Parsons' security operating procedures. AmorGroup was already compliant with these guidelines.

- Unlike ArmorGroup, Cochise's proposal lacked sample personnel, references, standard operating procedures, past experience details, and organizational structure.

- ArmorGroup was "able to field armored vehicles" due to its extensive contracts "throughout the Iraqi theatre." Cochise had no ability to provide its own vehicles, resulting in a significant cost increase to Parsons and the government. A subcontractor having its own vehicles was of significant benefit to Parsons and the government because they are "immediately available and are the subcontractor's responsibility to maintain."

- Cochise lacked the ability to supply all required equipment to its security teams, instead expecting Parsons or the government to provide it, which Parsons stated "demonstrates a lack of organizational structure and backing for this type of mission." "The ability to utilize a subcontractor's owned assets is key in providing maximum availability and performance of the mission, while reducing the overall risk and cost to the government and Parsons. ArmorGroup's proposal demonstrated it was able to provide all necessary equipment to carry out the mission.

- Unlike ArmorGroup's proposal, which had ArmorGroup providing all aspects of the subcontract, Cochise's proposal "indicated that the only thing that they would be willing or capable or providing in support of this mission is the personnel."

- "Cochise does not have a large amount of varied operational experience." By contrast, ArmorGroup has "an extensive and proven background in convoy and PSD operations in Iraq," and "has performed Class V and PSD work for the CMC contract."

- Cochise lacked "Key operational support issues, such as operations centers, intelligence reporting, combined organizational intelligence pooling, and appropriate liaison personnel and interfaces with critical organizations such as the LMCC and ROC." ArmorGroup had all these things.

- "Cochise has no ability or option to house personnel off-site," resulting in increased costs to the government, while ArmorGroup did have this capability.

- Comparing the prices quoted by each company, Parsons concluded that Cochise's labor rate was "exceptionally high," and, unlike ArmorGroup, failed to account for the full 24-7 pricing nature of the subcontract. Cochise's mobilization rates were also "extraordinarily high" compared to ArmorGroup,

whose bid did not pass on employee leave costs to Parsons. [Doc. 221-35 at pp.2-6].

The Evaluation concluded that Cochise's proposal was far more expensive than ArmorGroup's, while still lacking the equipment, communications, operations, command and control functions that ArmorGroup had, costs that would be passed on to the Government. Cochise's proposal also refused to "support functions other than specifically Class V and PSD functions," even though the RFP "clearly stated that the Class V and PSD missions would be secondary to providing regular logistical convoy security for the CMC program." [Doc. 221-35 at pp.5-6].

Without caveat, the Evaluation determined that ArmorGroup was the best value for the government in terms of price, comprehensiveness, and experience. [Doc. 221-35 at pp.2-6].

### H. Army Corps. Project Manager Shaw & CO Hamilton Interfere in the Competitive Bid Process, Directing Parsons to Sole-Source the Security Subcontract to Cochise.

On February 11, 2006, USACE PM Shaw sent an email to Parsons employees Gaines Newell, Joe Bell, and Relator Hunt stating, "After evaluating the proposals submitted for the PSD/Class V convoy missions, it is my opinion that the contractor that can best accomplish the mission is Cochise Consultancy." [Doc. 221-36]. On February 13, 2006, Runnels wrote to Parsons Program Manager Gaines Newell and stated "I have received the memo from the PM/KO recommending a particular

company. As is [*sic*] stands now, this is only a recommendation and not a directive from the PM/KO to utilize a particular company. If the client wants to utilize this certain company, I have no problem with that, but I need something more specific (directive) from the client." [Doc. 221-37].

Relator Hunt relayed Mr. Runnels' request to PM Shaw and CO Hamilton, stating, "Parsons will need a directive from the KO on the e-mail below today by the COB today so we can move on this we will need the Security team to start on February 18th with Parsons." *Id.* On February 14, 2006, Parsons received a directive from CO Hamilton stating in relevant part "[y]ou re [*sic*] hereby directed to award Cochise the subcontract." [Doc. 221-38]. Directive from USACE CO Hamilton to Parsons Hamilton testified that he issued the directive "purely on [Wayne] Shaw's recommendation." [Doc. 221-14 at p. 8 (Hamilton Depo., 22:9-24)].

### I. Some Parsons Employees Internally Question the Hamilton Directive to Sole-Source the Security Subcontract to Cochise.

Some Parsons employees immediately questioned the directive's legitimacy and refused to accept it: First, Runnels forwarded to Hill the "three proposals as received, [Parsons'] internal evaluation and the directive from the client to award to the highest bidder . . .To make matters worse, the client is insisting a security team be on the ground and ready to go by Feb. 18,20006 [sic]." [Doc. 221-39]. In response, Guy Irvin, Parsons' Country Security Manager in Iraq, expressed concerns over the propriety of the Hamilton Directive to make award to Cochise:

19

> Unless we are specifically instructed/ordered by the client to Sole Source this requirement (in writing) I recommend that <u>ArmorGroup</u> be awarded this contract <u>as they are without question the best value (from the technical point-of-view). ArmorGroup has the necessary experience, proven track record and value added components to make them the clear choice for this solicitation.</u> Given the available information (from the limited bid information provided) <u>Cochise is my last choice.</u>  It is my firm recommendation that this contract be awarded to ArmorGroup.

[Doc. 221-39]. There is no evidence in the record indicating that Parsons shared this evaluation with the USACOE. Later that day, Irvin expanded on his concerns:

> [T]hank you for sending the "Army Directive".  I have a problem with this letter in that Mr. <u>Hamilton refers to only two items in the Cochise bid (such as it is)</u> that differentiate this bid from the others <u>but are *not evident or included* such as "authorized weapons systems" and "qualified PLS drivers". All security providers will and have authorized weapons systems and do or will have qualified PLS drivers. This is *a very weak statement* for the USACE to make as justification to sole source this bid to Cochise.</u>  These comments are made because Mr. Hamilton has personal knowledge of Cochise (with a requisite comfort level) and <u>not because they were enumerated in their bid as they were not</u>.  I know we have to comply with the Corps' directive but I would also document our objections as to why we non-concur should this become an issue in the future (and it very well could). We'll salute and march forward but at least we will have done the dutiful thing and voiced our concerns.

[Doc. 221-40].  There is no evidence in the record indicating that Parsons shared this evaluation with the USACOE.  Glenn McLea, Parsons' Global Security Director, also made his opposition to the Hamilton Directive clear:

> This <u>whole issue with the security team stinks to high heaven</u>.  Cochise was not included in the original request for quote, they complained to the corp [sic] and Dwight reluctantly rebid, adding Cochise.  <u>Cochise comes in with the *highest most unacceptable bid*</u> and the corp [sic] issued a directive to use them. <u>This should send bells off with some one [sic]</u>.

[Doc. 221-8 at p.1 (Hiles Depo 179:11-172:11)]. There is no evidence in the record

indicating that Parsons shared this evaluation with the USACOE.

Similarly, Gary Breslau, Parsons' Manager of Procurement, explained his skepticism of the Hamilton Directive "[i]f the [U.S. Government] directs us in writing to use a particular security provider they are fully liable for the outcome, something that they are not going to like. However, the decision as to who we use for security for our staff is our decision, and ours alone." [Doc. 221-40].

Runnels further summarized Parsons employees' objections: "[j]ust so everyone is clear, everyone from the project from Gaines down is opposed to the choice made by the corp [*sic*]. Gaines and his group have been nothing but supportive for the procurement dept. and their efforts." [Doc. 221-40]. In the same thread, Runnels stated, Cochise was "the highest bidder with the least to offer," and "was only bidding labor and based on a 72 hour work week and we [Parsons, as opposed to the subcontractor] provide armored 550S or equivalent." *Id.* (emphasis added). There is no evidence in the record indicating that Parsons shared this evaluation with the USACOE.

### J. Parsons Program Manager Hiles Raises the Hamilton Directive to the Army Corp, and the Directive is Rescinded.

On February 15, 2006, Tim Hiles, Program Manager for Parsons, escalated Parsons' concerns to CO Hamilton's superior, USACE CO Cheryl Jones, who was located in Huntsville, AL. [Doc. 221-41]. Nothing in Hile's email indicates that he gave any information to CO Jones about the relative merits of the bids by

21

ArmorGroup and Cochise on the Security Subcontract, and in particular, there is no evidence that Parsons' February 11, 2006 Proposal Evaluation by Hoyt Runnels was shared with her. *Id.*; [Doc. 221-35].

CO Jones advised Hiles that she "has taken it to the USACE Office of Counsel and has indicated that they also are concerned with the potential liability to the Government with this kind of direction. The USACE intend to get on a teleconference together in the morning to discuss further. Cheryl has asked that we not proceed with the procurement until the USACE determines their path forward." [Doc. 221-7 at p. 12 (Hiles Depo., 164:9-170:10)] (Hiles remembering discussing with Jones how "off normal" it was to have a contracting officer order that a contract be awarded to a firm that had not been competitively selected). The USACE internal discussion resulted in the USACE formally rescinding the Hamilton Directive. [Doc. 221-42].

### K. The Army Corps, by CO Jones, Tells Parsons It Can Decide to Whom the Security Subcontract Should Be Awarded, and, Without Any Discussion of the Factual Merits of the Bidders' Ability to Fulfill the Contract, that the February 18 Start Date Should be Met.

Parsons escalated the issue to USACE in Huntsville, which consulted with counsel, *and then told Parsons it <u>did not need USACE's consent as to whom it could hire</u> and that  Parsons could  make the decision as  to  which  subcontractor  to hire on its own*. [Doc. 221-4]. Jones's email was directed to Steven Hamilton and Wayne Shaw, the two Corps managers who were advocating for Cochise to receive

the Security Subcontract. Nothing in Jones's email indicates that she received any information about the relative merits of the bids by ArmorGroup and Cochise on the Security Subcontract, or the specific concerns voiced by the Parsons employees involved in the evaluation process. In particular, there is no evidence that Parsons' February 11, 2006 Proposal Evaluation by Hoyt Runnels was shared with her. [Doc. 221-35]. Indeed, nothing in Jones's email evinces any awareness of ArmorGroup at all, much less that anyone had checked with ArmorGroup to learn its availability to deploy.

In fact, Tim Hiles' testimony about his conversation with Jones makes clear that there was no discussion of ArmorGroup, and that Hiles himself was unaware that ArmorGroup had the personnel and weapons on hand to fully staff the contract on February 18. [Doc. 221-8 at p. 6 (Hiles Depo., 189:15-202:21; 211:8-17)]. In discussing with Jones the purported urgent deadline of February 18 that was the rational for sole sourcing the Subcontract to Cochise, Hiles also had no idea if Cochise actually had the minimum requirement of 42 personnel to deploy by that date, when its own proposal stated it would have only 26 personnel. [Doc. 221-8 at p. 13 (Hiles Depo., 218:12-219:18.)].

As Jones' supervisor, Lydia Tadese, testified, Parsons was not "required" to comply with Cheryl Jones' instructions, and Jones was "not really directing Parsons… she's just talking to them." [Doc. 221-17 at p. 13 (Tadesse Depo., 43:10-

23

21; 46:9-21; 125:23-126:11; 135:23-136:12)]. For the "urgent and compelling" exception to apply to the competitive bidding default rule, however, Parsons was still obligated to comply with the Federal Acquisition Regulation requirements. [Doc. 221-17 at p. 30 (Tadesse Depo., 111:17-22; 113:1-21)].

**L. Parsons Sole-Sources the Security Subcontract to Cochise.**

As just noted, it was Parsons that told USACE that it would issue a sole source award to Cochise based on "urgency to meet mission deadlines" *starting in two days*. The decision to sole-source the Security Contract to Cochise was made by Parsons, not USACE. [Doc. 221-8 at p. 6 (Hiles Depo., 190:23-191:23; 192:18-193:5; 194:11-195:5; 198:3-22; 200:3-201:6; 211:8-17; 213:20-214:4; 279:13- 280:4; 285:14-286:2)] [Doc. 221-14 at p. 12 (Hamilton Depo., 41:17-42:13; 51:13-25)] [Doc. 233-1 at p. 64 (Irvin Depo., 245:11-246:13)]; [Doc. 221-48 at p. 1 (Shaw Depo., 164:16-20; 233:6-19; 335:17-337:20; 339:5-10; 342:13-343:5)].

In reality, Parsons had no urgent deadline constraints because it (Parsons) had been aware of the deadline to hire a security subcontractor for over a month prior to that deadline. [Doc. 221-8 at p. 11 (Hiles Depo., 209:5-211:17; 257:21-259:5)]; [Doc, 233-4 at p. 43 (Britton Depo., at163:1-21)]. In fact, Parsons had already determined in the competitive bidding process that it should hire ArmorGroup. [Doc. 221-35]; [Doc. 221-39].

On February 18, 2006, Parsons executed a Basic Operating Agreement

24

("BOA") with Cochise. [Doc. 221-15]; [Doc. 221-43].  On February 20, 2006—two days after the February 18 date Parsons had discussed with USACOE CO Jones as the urgent date that could not be moved and that only Cochise could fulfill—Parsons awarded Cochise the Security Subcontract by a Limited Notice to Proceed ("LNTP"), based on a bogus assertion of a non-existent unusual and compelling urgency. [Doc. 221-16].  By its terms, the LNTP award was just that – "limited."  The Limited Notice performance period was a mere two-weeks, from February 22, 2006 to March 6, 2006. [Doc. 221-16].

The record is devoid of any explanation as to why Parsons failed to use the competitive bidding process it had already conducted to award the permanent contract after the two-week Limited Notice period. Instead, Parsons gave the Security Subcontract to Cochise for another six (6) months and did not revert to the result of the competitive bidding it had already conducted and provide it to the competitive winner, ArmorGroup, or even attempt to engage in any subsequent competitive bidding, despite having previously altered the process to permit Cochise to submit a bid without it even having a basic operating agreement with Parsons. [Doc. 221-18 at p.2].  In fact, Newell's memo acknowledges that Parson's sole-source award of the Contract to Cochise was for an "abbreviated period of time" and that the contract could be "re-compete[d]," but then fails to provide a factual explanation of why that could not occur. *Id.*

25

Such a recompete after a short bridge contract for Cochise was precisely what CO Jones had discussed with Parsons' Tim Hiles on February 16 or 17, prior to Cochise receiving the sole-source contract. [Doc. 221-8 at p. 3 (Hiles Depo., at 179:17-180:4; 184:11-21; 225:12-226:21)]. Nor is there any evidence in the record indicating that Parsons discussed with the USACE Parsons' decision to give Cochise the permanent Subcontract for six months, instead of for an abbreviated period, as it had discussed with CO Jones.

Newell's memo invented *post hoc* sole-source rationales out of whole cloth, falsely asserting that only Cochise could meet the Security Contract's requirements and was the only bidder capable of timely providing all required personnel, the only firm that could perform under USACOE's Standard Operating Procedures and that was familiar with all the CMC locations, and the only firm properly trained to operate the equipment. Further, Newell asserted that if Parsons did not sole-source the Contract to Cochise, USCOE would have suffered financial loss, and that if operations continued without Cochise, personnel could be injured or killed. [Doc. 221-18 at p.2].

These assertions are entirely at odds with the detailed determinations made in Parson's February 11, 2006 Preliminary Evaluation of Proposals for the Security Contract authored by Hoyt Runnels finding that Cochise was woefully lacking in its ability to meet the Contract's requirements, and that ArmorGroup, by contrast "met"

"all requirements" was "the best in class proposal and represents the best value for the government in performance of the assigned missions." [Doc. 221-35 at pp.2-6].

Tellingly, other than Parson's previously discussed erroneous assumption that ArmorGroup couldn't start on February 18, there is no evidence in the record supporting any of Newell's statements that only Cochise could meet the Contract's requirements. Indeed, Parson's preordained decision to sole-source the Contract to Cochise is demonstrated by the memo's conclusory nature, which contains not a single factual statement explaining why ArmorGroup was no longer able to fulfill the Contract specifications for which Parsons had determined ArmorGroup was the "best in class" exactly one month earlier.

> **M.    The Evidence Does Not Demonstrate an Urgent & Compelling Need  to Sole-Source the Security Subcontract to Cochise, or to Award Cochise the Permanent Contract Instead of for the Limited Two-Week Period.**

In fact, there was no urgent and compelling need to mobilize by February 18. Parsons itself has already assumed (erroneously, in light of ArmorGroup's ability to deploy immediately) at the time it awarded the CMC Contract to ArmorGroup that ArmorGroup (or any other new contractor) would need a ramp-up period, and that the CMC's start date would be moved back.  [Doc, 233-1 at p. 28 (Irvin Depo., 02:18-106:17)]. Indeed, Parsons chose ArmorGroup over Cochise in the competitive bidding process even though Cochise represented that it would be able to deploy some personnel immediately, because Cochise was not qualified (i.e., lacked a basic

ordering agreement with Parsons, vehicles and equipment, demonstrated experience) to fill all of the Subcontract's expectations, and had submitted a two-page, incomplete proposal.  [Doc. 233-1 at p. 29 (Irvin Depo., 106:9-107:18)]. Hoyt Runnels, the Parsons manager in charge of evaluating the Security Contract bids, confirmed this: "There was no reason to single-source Cochise. If there had been a reason, a good reason, then we would consider it, but there was no reason to single-source Cochise." [Doc. 233-2 at p. 34 (Runnels Depo., 125:23-126:1)].

As Runnels explained, "There has to be a good reason [to single-source a contract] under the FAR [Federal Acquisition Regulations]. And since this is a government contract, they've got to have a good reason to sole-source. You know, 'Cochise is the only company in the Middle East that can do this.' That's a good reason for a single-source. But in this instance, there was no reason for a single source." [Doc. 233-2 at p. 35 (Runnels Depo., 129:4-11)]. "Because," Runnels said, "even though they're the client . . . we're governed under government regulations, not what Parsons has to say or what the [USACOE] has to say. If the FAR says you can't do it, you can't do it." [Doc. 233-2 at p. 35 (Runnels Depo., 129:20-25)]

Further, Runnels testified there was no urgency requiring Cochise to be given the CMC Contract on a sole-source basis, that Cochise did not have a good track record of performing the critical Class V and PSD convoys, and that because Cochise lacked the necessary armored vehicles, the mission would be further delayed. *Id.* at

28

[Doc. 233-2 at p. 43 (Runnels Depo., 164:21-165:7; 167:11-14; 179:15-18)]. Because Parsons already "had ArmorGroup on board" when Parson's decided to sole-source the contract to Cochise, "there [was] nothing urgent and compelling about it" . . . "we already had a team on board if worst came to worst." [Doc. 233-2 at p. 47 (Runnels Depo., 179:1-4)]. Runnels flatly denied that there was any unusual and compelling urgency that could justify Parsons granting the CMC Contract to Cochise. *Id.* at [Doc. 233-2 at p. 48 (Runnels Depo., 182:25-183:3)].

On February 21, 2006, Dwight Hill, Parsons Senior Subcontract Administrator, issued an Interoffice Correspondence regarding the sole source justification for award to Cochise that authorized Cochise "to proceed with the subject work effort in advance of execution of a definitized contract," citing the "unusual and compelling urgency" for logistical convoy support, with a period of performance commencing "on February 22, 2006 and end[ing] on March 8, 2006." [Doc. 221-16 at p.2].

Contrary to Parson's sole-source justification that Cochise was the only bidding contractor that could provide the personnel that the Security Contract required, it could not meet that requirement. The Contract's minimum personnel requirement was 42 individuals, available 24-7. [Doc. 221-32 at p.8]. In fact, for the week ending March 4, 2006, Cochise had only 22 people working on the contract (excluding personnel on Home Leave). [Doc. 221-22 at p.2] For the following week,

29

March 11, Cochise had only 26 (excluding personnel on Home Leave and Demobilization). [Doc. 221-22 at p.14]  And by April 1— six weeks after Parson's self-proclaimed "urgent" February 18 deadline to have the Contract fully staffed – Cochise still had only 29 people deployed. [Doc. 221-22 at p.29]

**N.      Parsons' Sole-Source Selection of Cochise in Violation of Federal Competitive Contracting Requirements Cost the Government in Excess of __**

The entire Subcontract was initially estimated to have an approximate cost of $8.8 million. Specifically, Cochise proposed to perform the Class V and PSD security services for Logistical Convoys in Iraq at the price of $8,835,488.12 and ArmorGroup's proposal to do the same work was $8,797,404.16. [Doc. 233-14 at pp.2-3. (Cochise Proposal) and Doc. 221-3 at pp. 31-36 (ArmorGroup Financial Proposal). Parsons' failure to engage in competitive bidding, however, doubled the cost of the Subcontract. Cochise, who did not fully perform under the Subcontract, was paid approximately $7.8 million to partially perform for 6 months. [Doc. 233-12 at pp. 2-3].  Because Cochise had insufficient manpower and lacked the ability to fully perform under the Subcontract, ArmorGroup was eventually hired as a subcontractor to Cochise to provide the very PSD and Class V security Cochise was supposed to provide.

For instance, the Subcontract for Logistical Convoy security services (i.e. the subcontract awarded to Cochise for Class V and PSD security) was performed

30

pursuant to Job Number 745015. [Doc. 233-12 at p. 2] After hiring Cochise on February 20, 2006 to provide Logistical Convoy Security pursuant to the Limited Notice to Proceed (LNTP), on April 1, 2006 Parsons ArmorGroup to perform Logistical Convoy Security services pursuant to Job Number 745015 – e.g. the same security services Cochise was providing under the same Job Number. [*See* Doc. 233-13 at 2-3]. In other words, in just 40 days after Cochise was selected to be the subcontractor for Task Order 10, Armor Group was hired to perform PSD and Class V work on the same Task Order. Consequently, Parsons paid another $6.2 million (approximately) to ArmorGroup so that ArmorGroup could complete the Subcontract. [*See* Doc. 233-13 at 2-3].

Because Parsons' and Cochise's concerted actions to sole-source the contract to Cochise, the government paid nearly double the estimated $8.8 million for security services. Stated, differently the government was fraudulently duped into overpaying by $5.2 million. The government paid a combined $14 million ($7.8 million to Cochise and $6.2 million to ArmorGroup) for Class V and PSD security services when it should have only paid a total of $8.8 million. [Doc. 233-12 at pp. 2-3; and Doc. 233-13 at 2-3].

In addition, ArmorGroup could have provided its own vehicles, communications, equipment, and weapons, but Cochise could not and did not. [Doc. 233-15 at pp. 2-6; and Doc. 221-3 at pp. 31-36 ]. ArmorGroup's proposal sought to

charge Parsons and the government a cost-per-day charge for ArmorGroup's use of its equipment. [Doc. 221-3 at pp. 35-36] The total cost-per-day charge for the entirety of the subcontract (i.e. 256 days) would have amounted to $4,197,073.92. This figure is derived by simply multiplying each line-item in the "Total Cost per Day USD" column on Doc. 221-3 at pp. 35-36 by 256 days and adding the line-item totals.

In contrast on February 21, 2006 – one day after it issued Cochise the fraudulent Limited Notice to Proceed – Parsons paid $2,917,500 for armored vehicles to be used by Cochise. [Doc. 217-9 at p. 28] This purchase was a wasteful expense that could have been avoided and/or substantially mitigated had the Subcontract been awarded to ArmorGroup (which already had its own armored vehicles, as Parsons noted in its February 11, 2006, Preliminary Evaluation of Proposals) in its entirety to begin with. [Doc. 233-15 at pp. 2-6]

By reimbursing Parsons for this expenditure Parsons caused the government to spend 69.5% of what the government would have paid ArmorGroup for the entire subcontract period, on just one group purchase for Cochise.    Similarly, the government spent millions on providing vehicles, communications, equipment, and weapons to Cochise, taxpayer funds that would not have been expended had Parsons hired ArmorGroup initially. [Doc. 217-9 at p.11 (Expert Witness Disclosure of Stuart W. Bowen, Jr. at pp. 2-15)]

While the federal government overpaid by having two separate security contractors to be hired to do work that should have been performed by one such contractor, Parsons made money and gained financially by hiring Cochise over Armor Group. With respect to costs incurred, the Subcontract for Logistical Convoy security services was a cost-plus fixed fee contract (CPFF).[1]

Here, with respect to the CPFF that Parsons was paid concerning the subcontract with Cochise, Parsons provided the following testimony: "Parsons has determined that, per the terms of W912-DY-04-D-0005 and the relevant modifications subsequently entered into between the United States Army Corps of Engineers and Parsons, Parsons applied a 3% fixed fee to all Fiscal Year 2006 Task 2 Support Activities' "Other Direct Costs," which included Cochise's support activity under the prime contract. *As such, Parsons received approximately $8,203,913.79 in payments from the Corps for services rendered by Cochise under subcontract no. 800618- 60006.*" (emphasis added). [Doc. 203-4 at p. 5  (Parsons' Supplemental Responses to the Relator's Written Deposition Questions, Supplemental Response Number 25)].[2]

---

[1] A CPFF contract contemplates reimbursement of the contractor (Parsons in this case) for the total allowable costs incurred incident to performance plus a percentage of the estimated cost. See the Harvard Law Review Association, *Determination of Cost in military Procurement Cost-plus-A-Fixed-Fee Contracts*, 65 Harv. L. Rev. 1035 (1952).

[2] Mathematically, Parsons claimed to have received $8,203,913.79 as a 3% fixed fee from USACE "for services rendered by Cochise under subcontract no. 800618-60006" Parsons spent approximately $273,463,793 on costs associated with Cochise's work as a subcontractor. This seems dubious may very well be an error by Parsons in responding to the written deposition

## SUMMARY OF THE ARGUMENT

The District Court erred in granting summary judgment against Counts II, III, and IV of the Amended Complaint.[3] As is well understood, summary judgment is inappropriate where there is a genuine dispute as to any material fact. *See, e.g. Georgia State Conference of NAACP v. Fayette Cnty. Bd. of Com'rs*, 775 F.3d 1336, 1343(11th Cir. 2015) (citing Fed.R.Civ.P. 56(a)) When ruling on a summary judgment motion, the court must construe the facts and draw all rational inferences therefrom in the manner most favorable to the "nonmoving party," and "may not weigh the evidence or find facts." *Id.* (cleaned up). "Nor may the court make credibility determinations of its own. Rather, the court is limited to deciding whether there is sufficient evidence upon which a fact-finder could find for the non-moving party." *Id.*

The District Court departed from those strictures here, both by misconstruing what the FCA prohibits, and from failing to apply the FCA correctly to the record before it. Relator Hunt has provided extensive evidence that Defendant Parsons made the decision to sole-source a Security Subcontract during the Iraq War to

---

question. Nonetheless, it is clear that purchasing vehicles, communications, equipment, and weapons for Cochise rather than paying rental charges for the use of ArmorGroup's equipment, greatly increased Parsons' CFPP revenue.

[3] Hunt does not appeal the district court's grant of summary judgment against Counts I and V, and he does not rely on the Amended Complaint's allegations of bribery, kickbacks, and gratuities.

Defendant Cochise, in stark violation of the requirement in the prime contract and federal law that subcontracts be awarded competitively. In so doing, Parsons caused the Government to incur millions of dollars in unnecessary expenses.

At the outset, Parsons did what it should by conducting a comprehensive competitive bidding process to award the Security Subcontract, which process was overwhelmingly won by ArmorGroup, which Parsons determined to be the most qualified bid and the best value for the Government. Of the three bids, Cochise was decisively last, making a paltry proposal that was defective in many key areas, including failing to provide its own armored vehicles and other equipment, lacking relevant experience, and, the most costly of the three.

Before Parsons was able to award the Subcontract to ArmorGroup, two managers from the Army Corps of Engineers (the government client that had awarded the prime contract to Parsons) interfered in the process, and sought to have Parsons direct the contract Cochise, without regard to the merits determined in the competitive bidding process. Some Parsons employees objected internally, and as a result, the sole-sourcing issue was brought to the attention of a Corps manager in Huntsville, Alabama.

There is extensive record evidence indicating that (1) Parsons did not provide the factual requirements of the Security Subcontract, or the factual merits of ArmorGroup's and Cochise's proposals and their respective abilities to fulfill the

35

Subcontract's requirements; (2) the Corps withdrew the directive and allowed Parsons to choose the Subcontract awardee; (3) Parsons falsely told the Corps manager that only Cochise could meet the deployment start date on the contract; and (4) the delay in awarding the contract was solely attributable to the Corps' interference in the mandatory competitive bidding process. Parsons then awarded the contract to Cochise for a limited, two-week period.

Shortly thereafter, and without any facts having changed since the original bidding process, Parsons awarded the full six-month contract to Cochise, instead of either awarding it to the firm it had already determined to be the most qualified and best value for the Government, ArmorGroup, or conducting a rebid. The record evidence amply shows this decision to be unsupportable. Having done so, Parsons employees then drafted *post hoc* documents creating false rationales to cover up its unlawful decision to sole-source the Subcontract.

On this record, the district court's grant of summary judgment was erroneous for several reasons. First, a contractor cannot invoke the government knowledge defense where, as here, there is not unequivocal evidence that the Government was fully informed of the particular facts bearing on the decision at hand. To the contrary, the evidence indicates Parsons provided virtually no relevant information to the Corps manager, and what information it provided was false, misleading, and woefully incomplete. Second, delays caused by an agency's own conduct, such as

the Corps interference in the competitive bidding process, do not, as a matter of law, constitute an unusual and compelling urgency that permits deviating from federal law's competitive bidding mandate.

The evidence demonstrates that ArmorGroup was ready to fully deploy on the Corps' chosen start date, and that Cochise was not. But even were that not the case, the Corps' own conduct delaying the Subcontract's award to the ultimate recipient is not a legally cognizable "urgency" that excuses compliance with competitive bidding. Third, Parsons' manufacture of false documents after awarding the contract to Cochise to justify the decision violates the FCA because those documents were capable of influencing the Government's decision to pay. The FCA's prohibition on creating false records contains no requirement that such documents actually be presented and/or relied upon by the Government. The FCA is violated when a false document is created that could influence the Government, such as by putting a document in the file, which, if reviewed by the Government, would cause the Government to continue making payments that would otherwise not be made if the Government knew the true state of affairs.

Fourth, by submitting requests for payments on a contract mandating that subcontracts be awarded competitively, Parsons was expressly or impliedly telling the Government—falsely—that the material condition had been complied with. Likewise, after having committed the original fraud of sole-sourcing the Security

37

Contract to Cochise, Parsons' payment requests fraudulently induced the Government to make payments. The FCA recognizes both theories of liability, which capture the FCA's core prohibition: to prevent the use of fraudulent means to obtain payments from the public fisc.

Finally, with the record evidence providing significant evidence of fraudulent conduct by Parsons and Cochise, jurors could reasonably infer from the transpiration of events between them that they acted in concert, and thus violated the FCA's conspiracy prohibition. The district court's grant of summary judgment against Counts II, III, and IV should be reversed, and remanded for trial.

## STANDARD OF REVIEW

A district court's summary-judgment decision is reviewed *de novo*, drawing all inferences in the light most favorable to the non-moving party. *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1315 n.9 (11th Cir. 2024).

## ARGUMENT

I.    **The District Court Erred In Applying the Government Knowledge Defense to Parson's Conduct, as the Evidence Does Not Unambiguously Demonstrate that Parsons Provided Complete, Accurate, Truthful, and Particularized Factual Information About the Capabilities of the Bidding Firms to Perform the Security Subcontract, Which Evidence Indicates that Parsons Provided Almost No Such Information, and Misled the Corp Into Believing that Only Cochise Could Perform the Contract.**

The District Court correctly observed that Hunt's Amended Complaint "rests on a 'false certification' theory of liability. [Doc. 278 at p.11]. The Court accurately recited that proving a false certification claim requires a relator to prove "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." [Doc. 278 at pp.11-12] (quoting *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015) (cleaned up)]. Additionally, the Court correctly observed "because scienter is a necessary element of a false certification claim, government knowledge of specific problems with a claim before the claim is submitted can wipe out the FCA's required scienter element, and therefore the entire false certification claim." [Doc. 278 at p.12 (cleaned up) (citing *Urquilla-Diaz,* 780 F.3d at 1057; *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999))].[4]

The court below erred, however, in finding that the "government knowledge" defense could apply under the disputed facts of this case. As the Fifth Circuit explained:

> The inaptly-named 'government knowledge defense' is the principle that under some circumstances, the government's knowledge of the falsity of a statement or claim can defeat FCA liability on the ground that the claimant did not act 'knowingly,' because the claimant knew that the government knew of the falsity of the statement and was willing to pay anyway. This defense is inaptly named because it is not

---

[4] This Court does not appear to have addressed the government knowledge defense.

a statutory defense to FCA liability but a means by which the defendant can rebut the government's assertion of the 'knowing' presentation of a false claim. Under this principle, where the government and a contractor have been working together, albeit outside the written provisions of the contract, to reach a common solution to a problem, no claim arises.

*United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 263 (2014) (cleaned up).

The defense is available only where the government contractor "shared all information" and gave "full knowledge" to the government. *United States ex rel. Butler v. Hughes Helicopter Corp.*, 71 F.3d 321, 327 (9th Cir. 1995); *United States ex. rel. Ubl v. IIF Data Solutions*, 650 F.3d 445, 453 (4th Cir. 2011). A "defendant's knowledge of the falsity of its claim . . . is not automatically exonerated by any overlapping knowledge by government officials." *United States ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1156 (2nd Cir. 1993).

A government contractor "cannot be said to have knowingly presented a fraudulent or false claim" "[i]f the government knows and approves of the particulars of a claim for payment before that claim is presented." *Durcholz*, 189 F.3d at 545. By contrast, such knowledge cannot be imputed to the government where the contractor misrepresents the state of affairs, particularly if it proffers half-truths or affirmative misrepresentations. *United States ex rel. Ladis v. Exelis, Inc.*, 824 F.3d 16, 25 (2nd Cir. 2016). The government knowledge defense is simply unavailable to a party who neglects to disclose "all pertinent information" to the government. *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.,* 400 F.3d

428, 455 n.21 (6th Cir. 2005); *accord, United States ex rel. Temple v. Sigmatech, Inc.*, 2015 WL 1486986 at *6 (N.D.Ala. March 30, 2015) (government's alleged lack of "full knowledge" of the claimed fraud precluded government knowledge defense).

The court below erred by conflating the government's knowledge of the *decision* to sole-source the Security Subcontract with the *factual reasons* for that decision. [*See* Doc. 278 at pp. 14-15] There is no evidence in the record of what information—if any—Parsons shared with CO Jones about the Security Subcontract and the relative merits of the bids received from the competing firms (ArmorGroup, Sabre, and Cochise). No document, and no testimony indicates that CO Jones was making her decision on the basis of accurate, complete, particularized, and truthful information. There is no evidence, for instance, that Jones was aware Parson's requirements in the RFQ, of the representations each firm made it its bid proposals, or (most crucially) Parsons' own February 11, 2006 evaluation of the bids authored by Hoyt Runnels.

No witness testified discussing the Subcontract's requirements or the merits of the three bids with Jones. Indeed, Jones's email suggests that she <u>had not</u> received complete and truthful information. She believed that Cochise was a "quality company" with a "good track record" for Class V convoys, despite Parsons having determined that Cochise was not qualified and that it lacked such experience. She

41

believed that no one else besides Cochise was available to deploy for the February 18 start date, when in reality, ArmorGroup was ready to do so, and Cochise was not.

The government knowledge inference that can negate an FCA defendant's scienter is possible at summary judgment only where the defendant was completely forthcoming and withheld no relevant information from the government. *United States ex rel. Burbaw v. Orenduff*, 548 F.3d 931, 953-54 (4th Cir. 2008). Where "there are competing factual claims . . . regarding the extent of the Government's knowledge of the alleged false claim, neither inherently more credible than the other, the Court must draw the inferences in the non-moving party's favor." *Temple*, 2015 WL 1486986 at *6 (cleaned up). Here, Parsons' failure to provide record evidence that it fully disclosed all the relevant information to CO Jones entirely precludes the government knowledge defense, and summary judgment on that basis was improper.

**II.    Ample Evidence Exists Demonstrating as a Matter of Fact & Law That there was No Unusual & Compelling Urgency that Could Justify Parsons Sole-Sourcing the Security Subcontract to Cochise.**

The District Court accepted as fact Parson's claim that it was compelled to select Cochise because there was an "urgency" and the "mission objective" was "getting a subcontract in place pronto." [Doc. 278 at p.8 (cleaned up)] But the court erred in making that factual assumption, both because there is material evidence demonstrating that the urgency claim was both (1) false, and because, as the district court itself acknowledged, (2) the information and decision came from Parsons, not

CO Jones at the USACOE. [*See* Doc. 278 at p.8 (citing 221-4) ("CO Jones stated that she had spoken with Parsons PM Hiles twice that day, and that he had informed her of Parsons plan to "sole source" the contract "to Cochise (based on urgency) to meet mission deadlines.") (emphasis added)]

The "unusual and compelling urgency" exception to the usual competitive bidding requirements in federal contracting is set forth at 48 C.F.R § 6.302-2, which provides in pertinent part:

(a) Authority.

(1) Citations: 10 U.S.C. 3204(a)(2) or 41 U.S.C. 3304(a)(2).

(2) When the agency's need for the supplies or services is of such an unusual and compelling urgency that the Government would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals, full and open competition need not be provided for.

(b) Application. This authority applies in those situations where—

(1) An unusual and compelling urgency precludes full and open competition; and

(2) Delay in award of a contract would result in serious injury, financial or other, to the Government.

(c) Limitations.

(1) Contracts awarded using this authority shall be supported by the written justifications and approvals described in 6.303 and 6.304. These justifications may be made and approved after contract award when preparation and approval prior to award would unreasonably delay the acquisition.

(2) This statutory authority requires that agencies shall request offers from as many potential sources as is practicable under the circumstances.

(d) Period of Performance.

(1) The total period of performance of a contract awarded or modified using this authority—

(i) May not exceed the time necessary—

(A) To meet the unusual and compelling requirements of the work to be performed under the contract; and

(B) For the agency to enter into another contract for the required goods and services through the use of competitive procedures;

48 C.F.R § 6.302-2.

None of the unusual and compelling urgency requirements were present that might have allowed USACOE or Parsons to circumvent the competitive bidding process for the Security Congress. A full and competitive bidding process had been held, and had been decisively won by ArmorGroup. Timing issues created by an agency's own conduct—such as USACOE Project Manager Wayne Shaw's and Contracting Officer Steven Hamilton's interference in the competitive bid process by pressuring and then order Parsons to give the contract to Cochise, thereby delaying its legally proper award—does not create a legally cognizable urgency. *AGMA Security Service, Inc. v. United States*, 152 Fed.Cl. 706, 728-36 (2021).

An agency's internal delays, and failure to rationally evaluate experience and past performance, are not an urgency justifying an unreasonable contract award. *Supreme Foodservice GmbH v. United States*, 109 Fed.Cl. 369, 389 (2013) ("[I]t undoubtedly takes more time to conduct a fair and rational competitive procurement than to follow other courses."). "Waiting until the last minute does not absolve [a government agency] of its obligations in this regard—a different view would turn the sole-source rules on their head." *Cherokee Nations Tech., LLC v. United States*, 116 Fed.Cl. 636, 640 (2014).

An agency's failure to follow up with a qualified bidder also does not constitute an urgency justifying a sole-source contract. *AGMA*, 152 Fed.Cl. at 732. Even though the purpose of a government contract may be an unusual and compelling urgency (like protecting convoys in a war zone), the government must solicit and consider bids from other qualified providers to determine if they can qualitatively fulfill the contract at a competitive price. *California Indust. Facilities Resources, Inc. v. United States*, 100 Fed.Cl. 404, 410-11 (2011). Even if Parsons had somehow forgotten that David Wilson at ArmorGroup had already informed Parsons that ArmorGroup was able to deploy on the contract whenever it awarded, both USACOE and Parsons were legally obligated to ascertain if ArmorGroup (or Sabre) could meet the deployment schedule promised by Cochise before converting the Security Contract to sole-source. [See [Doc. 233-8 at p.25 (Linsmier Depo.

91:11-20); see also   Doc. 233-8 at p.26 (Linsmier Depo., 96:7-97:2; 133:1-12; 136:16-137:2; 215:21-216-5)].

"[T]he types of circumstances that qualify as 'urgent and compelling' and that 'significantly affect interests' of the government are those in which there is the threat of immediate harm to health, welfare, or safety. Those are the sorts of 'significant adverse consequences' that must be identified by an agency as necessarily occurring in the absence of an override." *Supreme Foodservice*, 109 Fed.Cl. at 387-88 (cleaned up). No evidence has been produced from either USACOE or Parsons demonstrating harm to anyone's health, safety or welfare by granting the Security Contract to highly qualified ArmorGroup instead of unqualified Cochise. Indeed, notwithstanding the ostensible motive of "getting a subcontract in place pronto" for giving Cochise the contract on a non-competitive basis, Parsons (as Hoyt Runnels testified) had already taken into account the proposed February 18 start date when evaluating the relative qualifications and costs of ArmorGroup and Cochise. Indeed, an agency's failure to take into account the time needed to transition from one contractor to another is the kind of planning failure that does not constitute urgency, and cannot rationalize a sole-source contract. *Global Dynamics. LLC v. United States*, 137 Fed.Cl. 772, 777 (2018).

A government agency or contractor can hardly invoke an unusual and compelling need to sole-source a contract when it has already determined a

competitor can do the job better and faster, as Parsons had already determined with respect to ArmorGroup's ability to carry out the entire contract, an ability Cochise lacked. *See, e.g.*, *McAfee, Inc. v. United States*, 111 Fed.Cl. 696, 711 (2013) (Air Force could not rationalize sole-source contract under an unusual and compelling need when its own study demonstrated a competing proposal for network security was faster).

Even assuming, *arguendo*, that ArmorGroup would have been unable to deploy on exactly February 18 (which ArmorGroup Business Development Manager Linsmier emphatically states it would have), that still provides no justification for Parsons extending the initial 15-day Limited Notice to Proceed granted to Cochise for another six months. Nothing in the record supports Parson's grant of the full length of the Security Contract to Cochise when ArmorGroup was, by all accounts, able to carry out the contract. *See, e.g., Supreme Foodservice,* 109 Fed.Cl. at 389-90 (observing that sole source on a full contract period could not be justified when a limited bridge contract would have sufficed to permit a transition from the incumbent to a new contractor); *accord, Innovation Dev. Enters. of Am., Inc. v. United States*, 108 Fed.Cl. 711, 732-33 (2013). *See also, e.g., Per Aasleff A/S v. United States*, 123 Fed.Cl. 147, 158 (2015) (Even where an agency can demonstrate an immediate need for a sole-source bridge contract, the sole-source contract should be no longer than necessary to permit the remaining contractual period to be awarded

competitively). '[T]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *Cherokee Nation*, 116 Fed.Cl. at 641 (cleaned up).

### III.    The District Court Erred Dismissing Count III Because Parson's Creation Fraudulent Documents to Cover Up Its Wrongdoing Are Capable of Influencing the Government's Payment to Parsons.

Hunt's Count III claims Parsons violated § 3729(a)(1)(B) of the FCA by using two false documents to justify awarding the Security Subcontract to Cochise: (1) the Limited Notice to Proceed; and (2) SSA Hill's interoffice correspondence stating that the unusual and compelling urgency justification in "48 C.F.R. § 6.302-2(b) was applicable, and therefore precluded Parsons' obligation to engage in full and open competition." [*See* Doc. 278 at pp.16-17 (quoting Amended Complaint)] The District Court granted summary judgment against Count III, reasoning that even if the claims in those documents were objectively false, neither document could have influenced "the payment or receipt of money" § 3729(b)(4), "because both documents were prepared after Cochise was chosen as the subcontractor." [Doc. 278 at p.17]

The District Court's reasoning misapprehends the FCA's materiality standard. "The materiality of the false statement turns on whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action. Materiality focuses on the potential effect of the false statement when it is

made, *not on the actual effect of the false statement when it is discovered.*" *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 638-39 (4th Cir. 2015) (cleaned up) (emphasis in original). *See also United States ex rel. Feldman v. Van Gorp,* 697 F.3d 78, 96 (2d Cir.2012) (holding materiality requirement is objective, not subjective, and "does not require evidence that a program officer relied upon the specific falsehoods proven"). "In other words, the FCA reaches government contractors who employ false records that are capable of influencing a decision, not simply those who create records that actually do influence the decision." *Triple Canopy*, 775 F.3d at 639.

*Triple Canopy* concerned the creation of false records (shooting scorecards for guards) that would be used to justify the contractor's invoices to the government in the event the government reviewed the file to ascertain if the contract's requirement's (minimum objective competency with firearms) were being met. *Id.* at 639-40. It was of no moment whether the government *actually did review* the false record; the fake scorecards were created in anticipation that the government might do so, and were thus "material to a false or fraudulent claim." *Id.* So too, here, Parsons drafted the Limited Notice to Proceed and the memo asserting unusual and compelling urgency to cover up its false billing in the event the government questioned why Parson had evaded the competitive bidding requirement. *See also*

*id.* at 638 (observing that a contractor's creation of false documents to cover up wrongdoing are evidence demonstrating materiality).

"[A] contractor should not receive a windfall and escape FCA liability if—as the district court suggested here—a Government employee fails to catch an otherwise material false statement. That approach would be doubly deficient: it would inappropriately require actual reliance on the false record and import a presentment requirement from § 3729(a)(1)(A) that is not present in § 3729(a)(1)(B)." *Id.* at 639 (cleaned up); *accord*, *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 639 (7th Cir. 2016) (materiality does not require that a document be presented to the Government). Imposing a presentment requirement upon the false records prohibition in § 3729(a)(1)(B) would undermine one of the FCA's primary purposes: "policing the integrity of the government's dealings with those to whom it pays money," as "[t]he FCA is meant to cover all fraudulent attempts to cause the Government to pay out sums of money." *Triple Canopy*, 775 F.3d at 639 (cleaned up). Here, as in *Triple Canopy*, "the district court . . . erred in focusing on the actual effect of the false statement rather than its potential effect. A false record may, in the appropriate circumstances, have the potential to influence the Government's payment decision even if the Government ultimately does not review the record." *Id.*

50

**IV.  The Amended Complaint & Evidence Are Sufficient to Demonstrate Defendants Unlawfully Avoided Competitively Bidding the Security Subcontract by Sole-Sourcing it to Cochise on Pretextual Rationales.**

The District Court erred in granting summary judgment on Count IV. First, contrary to the District Court's suggestion, [*See* Doc. 278 at pp.20-23] the Amended Complaint explicitly stated that one of Relator's theories of liability against Defendants was their circumventing of the CMC Contract's requirement that subcontracts be competitively bid by fabricating an unusual and compelling urgency to justify sole-sourcing the Security Subcontract to Cochise. [See Doc. 118 at p. 5, ¶8 (Amended Complaint)]

Count IV asserts that Parsons and Cochise made express and implied certification claims for payment in violation of 31 U.S.C. § 3729(a)(1), § 3729(a)(1)(A), and § 3729(a)(2). [Doc. 118 at p. 44, ¶¶145-47] By billing the Government, Parsons was expressly and/or impliedly certifying that it had complied with the competitive bidding requirements of federal law. [Doc. 118 at p. 45, ¶ 148] Count IV expressly incorporated by reference the Amended Complaint allegations at ¶¶ 1-9, and 16-102. [Doc. 118 at ¶ 144] Those paragraphs plainly spelled out that the fraudulent "unusual and compelling urgency" justification Defendants concocted to illegally sole-source the Security Subcontract to Cochise, in violation of the CMC's requirement that Parsons competitively bid any subcontracts, as mandated

by federal law. [*See* Doc. 118 at pp. 3-5; p.14; pp.18-30; and pp. 31-35, ¶¶ 3, 6-8, 38, 49-51, 53-93, 97-99, 101, 103-111, 113-116]

It is difficult to imagine how much more specific the Relator's Amended Complaint could have been with respect to the legal theory and factual allegations of the illegal use of the sole-source rational to evade the competitive contracting requirements of the CMC Contract. The Amended Complaint provides, in detail, the who, what, where, when, and how required of an FCA complaint. *Gose v. Native Am. Servs. Corp.*, 109 F.4th 1247, 1318-19 (11th Cir. 2024).

Second, the District Court mistakenly failed to take stock of the circumvention of the competitive bidding process as being actionable under the FCA. When a government contractor provides false, misleading, or incomplete information to the Government which ultimately results in the contractor being paid sums it would not otherwise have been paid, an FCA claim is viable under either a false certification or fraudulent inducement theory. *See Marsterller for use and benefit of United States v. Tilton*, 880 F.3d 1302, 1314-15 (11th Cir. 2018) ("This incomplete data induced the Government to enter contracts on terms more favorable to [the contractor] than it would have had the pricing data been complete."); *United States ex rel. Longhi v. Lithium Power Technologies*, 575 F.3d 458, 466-72 (5th Cir. 2009) (false and misleading statements to Government that gave it erroneous impression of contractor's capabilities were actionable, even when services delivered, as the

fraudulent means used to obtain the contract were material to the government's decisions); *United States ex rel. Harrison v. Westinghouse Savannah River. Co.*, 353 F.3d 908, 911, 913-17 (4th Cir. 2003) (prime contractor's misrepresentation of subcontractor's status was capable of influencing government's funding decision, and thus actionable under the FCA, regardless of whether it did, as government might very well have disqualified the subcontractor had it received accurate information).

Here, Relator has proffered evidence that Parsons failed to completely and accurately inform the Army Corps of the factual merits of the Security Subcontractor firms, causing the Government to approve a sole-source contract that was not justified, and resulting in payments to Parsons and Cochise that would otherwise not have been made. Summary judgment on this Count was error. [See Doc. 232 at pp.32-33 and Doc. 233-6 at pp.2-3 (each voucher Parsons to the Government requesting payment for purchases and services expressly and/or implicitly certifies that "this voucher is correct *and proper for payment.*"] (emphasis added)

**V. Count II Adequately Pleads Conspiracy Under § 3729(a)(1)(C), For Which Relator Provided Evidence in Conduct by Parsons & Cochise From Which a Jury Could Infer an FCA Conspiracy.**

"[T]he FCA makes liable any person who 'conspires to commit a violation of'' the FCA. *See* 31 U.S.C. § 3729(a)(1)(C).'" *Gose*, 109 F.4th at 1319. An FCA conspiracy claim requires the plaintiff to show "(1) that the defendant conspired with

one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Id.* (cleaned up). Here, "Relators' complaint not only pleads these elements, but it does so with particularity by alleging facts as to time, place, and substance of [Parsons and Cochise's] alleged fraud, including 'he details of [their] allegedly fraudulent acts, when they occurred, and who engaged in them." *Id.* at 1319-20 (cleaned up).

The District Court averred that in the absence of underlying FCA violations, Relator Hunt could not state a viable FCA conspiracy claim. [Doc. 278 at p.28] This is an accurate statement of law; however, as demonstrated, *supra*, Counts III and IV do state viable false records and false certification claims for which he has provided ample evidence from which a jury could reasonably infer that Parsons caused the Security Subcontract to be sole-sourced in violation of the CMC Contract and federal contracting law.

"The essence of conspiracy is the agreement to engage in concerted unlawful activity. There is no requirement, however, that the agreement be express. In fact, the secret nature of a conspiracy in most instances requires the trier of fact to infer its existence from the surrounding circumstances." *United States v. Hartley*, 678 F.2d 961, 972 (11th Cir. 1982) (cleaned up); *Gilbrook v. City of Westminster*, 177

F.3d 839, 857 (9th Cir. 1999) (cleaned up) ("Acts which seem otherwise innocent, when viewed in the context of the surrounding circumstances, may justify an inference of complicity."). *Accord, United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991) (FCA conspiracy allegations may be proven by inferences from the parties' conduct). Having proffered evidence of illegal conduct by Parsons to benefit both Parsons and Cochise in the form of millions of dollars in government payments that would not otherwise have occurred, a jury may permissibly infer a conspiracy occurred in violation of § 3729(a)(1)(C).

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's summary judgment grant against Amended Complaint Counts II, III, and IV, and remand those Counts for trial.

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,012 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared with a minimum font size of 14-point Times New Roman, a proportionally spaced font, using Microsoft Word.

/s/ Larry Golston, Jr
OF COUNSEL

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 18, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/EFC participants, or if not a CM/ECF participant, it has been served by U.S. mail, postage prepaid.

Duane A. Daiker
SHIMAKER, LOOP & KENDRICK, LLP
101 East Kennedy Blvd., Suite 2800
Tampa, Florida 33602-5126
(813) 227-2329
ddaiker@shumaker.com

Aaron S. Dyer
Ronald L. Cheng
Derek M. Mayor
PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
725 South Figueroa Street, Suite 3600
Los Angeles, California 90017
(213) 488-7100
Aaron.dyer@pillsburylaw.com
Ronald.cheng@pillsburylaw.com
Derek.mayro@pillsburylaw.com

G. Bartley Loftin, III
Angela M. Schaefer
LOFTIN, HOLT, HALL & HARGETT, LLP
200 Clinton Avenue, Suite 405
(256) 929-7997
bartley@loftinholt.com
angela@loftinholt.com

_/s/ Larry A. Golston, Jr. _____
Larry A. Golston, Jr.