**No. 25-11147**

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

UNITED STATES OF AMERICA *EX. REL.* BILLY JOE HUNT,

Plaintiff-Appellant,

v.

COCHISE CONSULTANCY, INC., ET AL.,

Defendants-Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
CASE NO. 5:13-CV-02168-LCB

---

**ANSWERING BRIEF OF DEFENDANT-APPELLEE
THE PARSONS CORPORATION
D/B/A PARSONS INFRASTRUCTURE & TECHNOLOGY**

---

Aaron S. Dyer
*aaron.dyer@pillsburylaw.com*
Ronald L. Cheng
*ronald.cheng@pillsburylaw.com*
Derek M. Mayor
*derek.mayor@pillsburylaw.com*
Pillsbury Winthrop Shaw Pittman LLP
725 South Figueroa Street, 36th Floor
Los Angeles, California 900175524
Telephone:  (213) 488-7100

G. Bartley Loftin, III
*bartley@loftinholt.com*
Angela M. Schaefer
*angela@loftinholt.com*
Loftin Holt Hall & Hargett LLP
200 Clinton Ave. W, Suite 405
Huntsville, Alabama 35801
Telephone:  (256) 929-7997

***Counsel for Defendant-Appellee The
Parsons Corporation d/b/a Parsons
Infrastructure & Technology***

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................i

TABLE OF CITATIONS ........................................................................... iii

APPELLEE'S CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ........................................1

STATEMENT REGARDING ORAL ARGUMENT ...............................4

STATEMENT REGARDING ADOPTION OF BRIEFS OF

OTHER PARTIES ....................................................................................5

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ....6

STATEMENT OF THE ISSUES................................................................6

STATEMENT OF THE CASE ..................................................................7

I. INTRODUCTION.................................................................................7

II. STATEMENT OF FACTS ...............................................................11

     A. The CMC Subcontract....................................................................11

     B. The Initial Request for Quotations and Cochise's Inclusion in the
Process ..................................................................................................33

     C. USACE's Selection of Cochise.......................................................41

     D. Execution of the Subcontract..........................................................21

III. PROCEDURAL HISTORY.............................................................22

IV. STANDARD OF REVIEW..............................................................24

SUMMARY OF ARGUMENT..................................................................25

I. THE DISTRICT COURT CORRECTLY APPLIED THE GOVERNMENT
KNOWLEDGE DEFENSE BASED ON USACE'S DIRECTIVE TO SELECT
COCHISE.................................................................................................28

A.  Government Knowledge Negates Scienter and Materiality Under Established Precedent ................................................................................29

B.  Relator's New Disclosure Claim Was Not Preserved and Fails on the Merits ...........................................................................................................33

C.  *Schutte* Forecloses Relator's Scienter Argument ....................................41

D.  Even if Government Knowledge Somehow Did Not Resolve Relator's Subsidiary Claims, Each of Those Claims Must Fail...................................44

1.  Government Knowledge is Fatal to Relator's Attack on the Sole-Sourcing of the Subcontract ................................................................44

2.  Relator's Attack on the LNTP and the March 11 Internal Sole Source Memo Fail Because They Postdated the Award and Were Not Part of a Payment Claim........................................................................45

3.  The Record Demonstrates that the "Urgent and Compelling" Need Came from the Government..............................................................50

4.  The District Court Correctly Rejected Relator's Unsupported False Certification Theory Based on Standard Form 1034.................52

5.  The District Court Correctly Rejected Relator's Argument That Parsons Committed Fraud When It Did Not Perform a Second Competition .....................................................................................53

II. THE DISTRICT COURT PROPERLY REJECTED RELATOR'S CONSPIRACY CLAIM BECAUSE THERE IS NO GENUINE ISSUE OF MATERIAL FACT WITH RESPECT TO HIS UNDERLYING FCA Claims ........................................................................................................  55

III. CONCLUSION .........................................................................................56

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS…………...…………………………………...………58

CERTIFICATE OF SERVICE …………………………………...………58

ii

# TABLE OF CITATIONS

Page(s)

Cases

*Access Now, Inc. v. Southwest Airlines Co.*,
  385 F.3d 1324 (11th Cir. 2004) ................................................................34

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...............................................................................25

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
  139 S. Ct. 1507 (2019)............................................................................23

*D'Agostino v. cv3, Inc.*,
  845 F.3d 1 (1st Cir. 2016)........................................................................30

*Depree v. Thomas*,
  946 F.2d 784 (11th Cir.1991) ...................................................................34

*Feldman v. Van Gorp*,
  697 F.3d 78 (2d Cir. 2012) .................................................................48, 49

*Gilmour v. Gates, McDonald & Co.*,
  382 F.3d 1312 (11th Cir. 2004) ................................................................53

*Hurley v. Moore*,
  233 F.3d 1295 (11th Cir.2000) .................................................................34

*In re Shelton*,
  No. 11-12075, 481 Fed. Appx. 520 (11th Cir. July 3, 2012) ............................55

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)...............................................................................25

*McCarthy v. Kleindienst*,
  741 F.2d 1406 (D.C. Cir. 1984).................................................................56

*Midrash Sephardi, Inc. v. Town of Surfside*,
  366 F.3d 1214 (11th Cir.2004) .................................................................34

*Ruckh v. Salus Rehabilitation, LLC*,
  963 F.3d 1089 (11th Cir. 2020) ................................................................30

*Shaw v. AAA Eng'g & Drafting, Inc.*,
    213 F.3d 519 (10th Cir. 2000) ...................................................................29

*Temple v. Sigmatech, Inc.*,
    No. 5:13-cv-44, 2015 WL 1486986 (N.D. Ala. Mar. 30, 2015) .........................37

*Triple Canopy, Inc. v. United States ex rel. Badr*,
    579 U.S. 924 (2016) ...................................................................................47

*United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*,
    400 F.3d 428 (6th Cir. 2005) .....................................................................35

*United States ex rel. Becker v. Westinghouse Savannah River Co.*,
    305 F.3d 284 (4th Cir. 2002) .....................................................................29

*United States ex rel. Bibby v. Mortgage Inv'rs Corp.*,
    987 F.3d 1340 (11th Cir. 2021) ..................................................................30

*United States ex rel. Burlbaw v. Orenduff*,
    548 F.3d 931 (10th Cir. 2008) .........................................................29, 32, 36

*United States ex rel. Butler v. Hughes Helicopters, Inc.*,
    71 F.3d 321 (9th Cir. 1995) .......................................................................36

*United States ex rel. Colquitt v. Abbott Labs.*,
    858 F.3d 365 (5th Cir. 2017) .....................................................................29

*United States ex rel. Costner v. United States*,
    317 F.3d 883 (8th Cir. 2003) .....................................................................29

*United States ex rel. Durcholz v. FKW Inc.*,
    189 F.3d 542 (7th Cir. 1999) .................................................................29, 45

*United States ex rel. Foreman v. AECOM*,
    19 F.4th 85 (2d Cir. 2021) ....................................................................31, 32, 44

*United States ex rel. Gagne v. City of Worcester*,
    565 F.3d 40 (1st Cir. 2009) ........................................................................55

*United States ex rel. Garbe v. Kmart Corp.*,
    824 F.3d 632 (7th Cir. 2016) .....................................................................49

*United States ex rel. Hagood v. Sonoma Cnty. Water Agency*,
929 F.2d 1416 (9th Cir. 1991) ....................................................................29, 35

*United States ex rel. Harman v. Trinity Indus., Inc.*,
872 F.3d 645 (5th Cir. 2017) ...................................................................................31

*United States ex rel. Heath v. AT&T, Inc.*,
791 F.3d 112 (D.C. Cir. 2015)..................................................................................55

*United States ex rel. Jackson v. University of North Texas*,
No. 4:13-CV-734, 2016 WL 369693 (E.D. Tex. Feb. 1, 2016) ........................36

*United States ex rel. Kelly v. Serco, Inc.*,
846 F.3d 325 (9th Cir. 2017) ...................................................................................31

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
985 F.2d 1148 (2d Cir. 1993) ........................................................................29, 35

*United States ex rel. Ladas v. Exelis, Inc.*,
824 F.3d 16 (2d Cir. 2016) ......................................................................................36

*United States ex rel. Marsteller v. Tilton*,
556 F. Supp. 3d 1291 (N.D. Ala. 2021).......................................................46, 56

*United States ex rel. McBridge v. Halliburton Co.*,
848 F.3d 1027 (D.C. Cir. 2017)................................................................................32

*United States ex rel. Petratos v. Genentech Inc.*,
855 F.3d 481 (3d Cir. 2017) ...................................................................................31

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
857 F.3d 1148 (11th Cir. 2017) .............................................................................25

*United States ex rel. Radcliffe v. Purdue Pharma L.P.*,
600 F.3d 319 (4th Cir. 2010) .................................................................................36

*United States ex rel. Ritchie v. Lockheed Marin Corp.*,
558 F.3d 1161 (10th Cir. 2009) .............................................................................36

*United States ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023)........................................................................ *24,* 26, 41-44

*United States ex rel. Spay v. CVS Caremark Corp.*,
   875 F.3d 746 (3d Cir. 2017) ..................................................................29

*United States ex rel. Thomas v. Black and Veatch*,
   820 F.3d 1162 (10th Cir. 2016) ...........................................................32

*United States ex rel. Ubl v. IIF Data Solutions*,
   650 F.3d 445 (4th Cir. 2011) ...............................................................36

*United States ex rel. Yannacopoulos v. Gen. Dynamics*,
   652 F.3d 818 (7th Cir. 2011) .........................................................31, 40

*United States v. Bollinger Shipyards, Inc.*,
   775 F.3d 255 (5th Cir. 2014) ...............................................................24

*United States v. Southland Mgmt. Corp.*,
   326 F.3d 669 (5th Cir. 2003) (*en banc*) (E. Jones, J., concurring).....................35

*United States v. Triple Canopy, Inc.*,
   775 F.3d 628 (4th Cir. 2015) .............................................47, 48, 49

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
   579 U.S. 176 (2016)................................................. *25,* 30, 32, 39, 46, 47, 50, 53

*Urquilla-Diaz v. Kaplan Univ.*,
   780 F.3d 1039 (11th Cir. 2015) .....................................................24, 25

*Walker v. Jones*,
   10 F.3d 1569 (11th Cir.1994) ...............................................................34

## Statutes and Codes

United States Code,
   Title 28, Section 1291 ..............................................................................6
   Title 28, Section 1331 ..............................................................................6
   Title 31, Section 3729(a)(1)(A) ...........................................................50
   Title 31, Section 3729(a)(1)(B) ...........................................................50
   Title 31, Section 3729(a)(1)(C) ...........................................................55
   Title 31, Section 3729(b)(1)(A)...........................................................42

## Rules and Regulations

Code of Federal Regulations,
  Title 48, Section 1.104................................................................25
  Title 48, Section 2.101................................................................25
  Title 48, Section 6.101............................................................25, 51
  Title 48, Section 6.302-2(b)..........................................................46
  Title 48, Section 16.603..........................................................50, 55
  Title 48, Section 52.244-5........................................................26, 51

Federal Rules of Appellate Procedure
  Rule 26.1(a)..........................................................................1, 2
  Rule 34(a)(2)............................................................................4

Federal Rules of Civil Procedure
  Rule 56(a)..............................................................................24

## Other Authorities

*J. Boese, Civil False Claims and Qui Tam Actions*,
  Section 2.03[F][3] (4th ed. 2011) ....................................................30

## DEFENDANT-APPELLEE'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1(a)(3), Defendant-Appellee, The Parsons Corporation d/b/a Parsons ("Parsons"), submits the following Certificate of Interested Persons & Corporate Disclosure Statement:

Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. (Counsel for Relator-Appellant)

Burke, Hon. Liles C. (District Court Judge)

Chalmers, Adams, Backer & Kaufman, LLC (Counsel for Relator-Appellant)

Cheng, Ronald (Counsel for Defendant-Appellee Parsons)

Cochise Consultancy, Inc. d/b/a Cochise Security (Defendant-Appellee)

Cole Jr., Kenneth (Counsel for Relator-Appellant)

Conchin, Gary (Counsel for Relator-Appellant)

Conchin, Cole, Jordan & Sherrod (Counsel for Relator-Appellant)

Daiker, Duane A. (Counsel for Defendant-Appellee Cochise)

Dyer, Aaron (Counsel for Defendant-Appellee Parsons)

Golston, Larry (Counsel for Relator-Appellant)

Hampton Jr., Leon (Counsel for Relator-Appellant)

Haynes, Jessica (Counsel for Relator-Appellant)

1

Hunt, Billy Joe (Relator-Appellant)

Loftin III, Gordon Bartley (Counsel for Defendant-Appellee Parsons)

Long III, Don B. (Counsel for non-party real party in interest, United States Attorney's Office – NDAL [declined to intervene under the FCA])

Mayfield III, Earl (Counsel for Relator-Appellant)

Mayor, Derek (Counsel for Defendant-Appellee Parsons)

Miles, Lauren (Counsel for Relator-Appellant)

Parsons Government Services Inc. (Affiliate of Defendant-Appellee)

Pillsbury Winthrop Shaw Pittmann LLP (Counsel for Defendant-Appellee Parsons)

Proctor, Hon. R. David (District Court Judge)

Schaefer, Angela (Counsel for Defendant-Appellee Parsons)

Shumaker Loop & Kendrick LLP (Counsel for Defendant-Appellee Cochise)

The Parsons Corporation d/b/a Parsons Infrastructure & Technology (stock ticker "PSN") (Defendant-Appellee)

Warchola, Robert (Counsel for Defendant-Appellee Cochise)

Additionally, pursuant to Federal Rule of Appellate Procedure 26.1(a) and Eleventh Circuit Rules 26.1-1, -2, and -3, Parsons makes the following disclosure:

2

1.      Parsons Corporation is a publicly traded company—its stock ticker is "PSN."

2.      There is no publicly held corporation that owns 10% or more of Parsons Corporation's stock.

## STATEMENT REGARDING ORAL ARGUMENT

Parsons respectfully submits that oral argument is unnecessary in this case. The District Court's order granting summary judgment was thorough, well-reasoned, and supported by a factual record with no material disputes.  The legal issues presented in the appeal are straightforward and governed by established precedent.  Further, Relator has failed to present any viable theory of False Claims Act liability.  Accordingly, Parsons requests that this Court decide the matter on the briefs and dispense with oral argument pursuant to Federal Rule of Appellate Procedure 34(a)(2).

## STATEMENT REGARDING ADOPTION
## OF BRIEFS OF OTHER PARTIES

Parsons does not adopt any part of any other party's brief.

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331.  This Court has jurisdiction to hear this appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.　　Whether the district court properly granted summary judgment where Relator failed to show a genuine issue of material fact to establish a false claim under Relator's false certification theory (a) where Parsons followed a Government direction to award the subcontract at issue to one company based on the Government's operational urgency rather than the company Parsons initially selected; and (b) where Relator's subsidiary claims are not only controlled by the district court's primary ruling, but (i) the Government was fully aware of Parsons' sole-sourcing of the subcontract; (ii) the internal documents that Relator claims were false or fraudulent postdated any decision by the Government to make any award, were never presented to the Government and were otherwise not material; and (iii) Relator's new false certification theory was waived because it was not brought previously, was based on a document that was not presented by or certified by Parsons, and did not contain any statement by Parsons.

2.　　Whether Relator's failure to demonstrate a genuine issue of material fact concerning his False Claims Act claims was also fatal to his conspiracy claim.

**STATEMENT OF THE CASE**

## I.    INTRODUCTION

In the more than twelve years since this False Claims Act ("FCA") *qui tam* action was filed, it has become clear that defendant The Parsons Corporation ("Parsons") did nothing wrong.  Parsons conducted a competitive bidding process to select an armed security contractor; was instructed by the U.S. Army Corps of Engineers ("USACE") contracting officer in Iraq to instead choose a different contractor, co-defendant Cochise Consultancy, Inc. ("Cochise," collectively with Parsons, "Defendants");[1] refused to follow that direction because of concerns about the actions of the USACE contracting officer in Iraq; escalated the decision to USACE headquarters in Huntsville, Alabama; and made the award to Cochise only after the Huntsville USACE's contracting officer directed it to do so because Cochise was the incumbent contractor under the prior contract, with proven performance providing the services in the contract, and was the only contractor who could meet the USACE's urgent and compelling need requirement that the contractor provide the services within two days.

---

[1] On joint motion between Relator and Cochise, this Court dismissed Cochise from this appeal on August 13, 2025.  (Eleventh Circuit Court of Appeals docket control number ["Ct. Doc."] 34).

For more than ten years while he litigated this case, Relator Billy Hunt's ("Relator's") primary, if not only, theory that this conduct violated the FCA was that co-defendant Cochise had paid bribes and kickbacks to USACE officials in Iraq to obtain the award. Finally, after years of expensive litigation and discovery, Relator abandoned this inflammatory theory – a theory that dominated both Relator's original and revised complaints and was based almost entirely on Relator's alleged personal knowledge –and admitted that he had no evidence that anyone had provided kickbacks or bribes or had engaged in a conspiracy to violate the FCA. (RA II, Dkt. 234 at 32; *id*. at Dkt. 278 at 11.)[2] To replace his now-recanted "bribery" theory, Relator attempted to craft an alternative eleventh-hour "Hail Mary" – his "false certification" theory – to attempt to show some measure of wrongdoing. (*Id*. at Dkt. 278 at 20-21.) Still, he presented no evidence of wrongdoing whatsoever. (*Id*. at Dkt. 278 at 23 n. 7.)

In granting summary judgment for defendants, the district court recognized that Parsons fully adhered to the Government's informed direction. (*Id*. at Dkt. 278 at 15.) The district court also recognized all of Relator's failures and, with no

---

[2] "AOB" refers to Relator-Appellant's Corrected Opening Brief (Ct. Doc. 30), followed by the relevant page number. "RA" refers to Relator-Appellant's Appendix (Ct. Doc. 31-1, 31-2, or 31-3), and "PA" refers to Defendant-Appellee Parsons' Supplemental Appendix filed concurrently with this brief, followed by the relevant volume, docket/tab, and page number. "Dkt." refers to the district court docket, followed by the relevant docket control number and any applicable page number.

factual disputes on Relator's remaining claims, properly granted summary judgment in favor of defendants.  (*Id*. at Dkt. 278 at 29-31.)

This case arises from a 2006 subcontract award made by defendant Parsons under its prime contract with USACE during the U.S.-led reconstruction of Iraq. (*Id*. at Dkt. 278 at 2.)  USACE's task order required Parsons to secure a subcontractor for high-risk security services, stationed at Camp Victory in Baghdad, Iraq, with an urgent deployment requirement.  (*Id*.; PA II, Dkt. 221-19 at 209-11.)  Parsons received three bids, including a bid from Cochise, which participated in the bidding process at USACE's direction. (RA II, Dkt. 278 at 5.)

After evaluating the three proposals Parsons originally selected ArmorGroup.  (*Id.*; PA V, Dkt. 221-26 at 8.)  The USACE contracting officer stationed in Iraq, however, issued a directive requiring Parsons to select Cochise on the basis of operational urgency and its ability to start work immediately with incumbent personnel.  (PA V, Dkt. 221-38.)

Following internal concerns about that directive raised by Parsons' personnel, the company elevated the issue to USACE headquarters personnel in Huntsville, Alabama.  (*Id*. at Dkt. 221-41 at 2.)  The USACE personnel in Huntsville who supervised the contracting officer in Iraq reaffirmed that urgency and operational necessity required immediate performance and directed Parsons to proceed with Cochise in a decision issued within two days before the date required

9

for performance.  (PA I, Dkt. 221-4 at 2; PA V, Dkt. 221-38 at 2.)  Parsons complied with that directive, executed a Basic Ordering Agreement ("BOA") with Cochise on February 18, 2006, and issued a Limited Notice to Proceed two days later, with full contract execution completed by February 27, 2006.  (PA I-II, Dkt. 221-15 at 1-14.)  The uncontroverted record reflects that the Government was not only fully aware of the circumstances, but it also directed Parsons' actions and later ratified the subcontract award.  (RA II, Dkt. 278 at 8–9, 11.)

Relator-Appellant Billy Hunt, a former Parsons Deputy Project Manager in Iraq who was later convicted of unrelated kickback misconduct, filed this *qui tam* action under the FCA after his release from incarceration.  (*Id.* at Dkt. 278 at 9; PA V, Dkt 221-31.)  Relator initially asserted that Parsons, Cochise, and the Government's personnel in Iraq participated in an elaborate bribery and kickback scheme littered with expensive travel, villa accommodations, jewelry, and entertainment.  (*Id.* at Dkt. 1 ¶¶ 4, 34, 81-82, 97; *id.* at Dkt. 118 ¶¶ 4, 36-37, 95-96, 121, 126.)  Only after years of discovery revealed no such evidence did Relator, in the midst of summary judgment briefing, abandon his bribery and kickback allegations and attempt to expand upon his current theory alluded to loosely in the operative complaint: that Parsons fraudulently awarded the subcontract at issue to Cochise in contravention of competitive bid requirements.  (*Id.* at Dkt. 278 at 1, 10-11.)  The district court granted Defendants' summary judgment on the claims

10

stemming from this allegation, concluding that the undisputed record showed that the Government required Parsons to award the subcontract to Cochise. (*Id*. at Dkt. 278 at 15.)

Finding that Parsons had acted at the direction of the Government, the district court applied well-established precedent to hold that Relator failed to raise a genuine dispute of material fact regarding scienter or materiality. (*Id*. at Dkt. 278 at 11.) The FCA requires evidence that a defendant knowingly submitted a false claim and that the alleged falsehood was material to the Government's payment decision—standards Relator cannot meet. The record confirms that USACE not only approved but directed the subcontract award, defeating any inference of deceptive intent or reliance. Relator's claims—whether considered collectively or as to Relator's attempts to dissect them into components—fail for that reason. The district court properly granted summary judgment because there was no scienter, no materiality, and no evidence of fraud, and this Court should affirm.

## II.   STATEMENT OF FACTS

### A.   The CMC Subcontract

During the relevant time period, Parsons specialized in engineering, construction, technical services, and project management and performed numerous contracts for the United States Government in these areas of expertise during the Iraq war. (PA II, Dkt. 221-19 at 204-211.) In 2004, USACE awarded a Coalition

11

Munitions Clearance prime contract ("CMC Contract") to Parsons to disarm and remove dangerous unexploded ordnance scattered throughout Iraq. (*Id*. at Dkt. 221-23.) During the time of the award, Relator was the Northern Operations Deputy Manager for Parsons' CMC Contract.

This case concerns a particular subcontract that fell under the CMC Contract. In January 2006, USACE issued a task order that "required Parsons to hire a subcontractor to provide Class V security (logistical convoys transporting explosives and ordnances) and Personnel Security Detail ("PSD") services (protection of people, including both USACE officials and Parsons employees, as they moved between sites outside of established U.S. military bases in Iraq) and the operation of a 'reception facility in Kuwait[.]'" (PA IV, Dkt. 221-24; RA II at Dkt. 278 at 2-3.) The task order also required a third type of mission for "other logistical convoys," including materials such as water, food, portable toilets, or other non-explosives. (PA IV, Dkt. 221-24 at 13-14.)

Cochise operated in Iraq as a civilian contractor and was the "incumbent provider" of these services to USACE in Iraq, and "had been providing [Class V and PSD] services under a subcontract to [the prior prime contractor] U.S.A. Environmental (USAE) for the previous 2 years." (*See* PA I, Dkt. 221-18; PA III, Dkt. 221-19 at 221; RA II at Dkt. 278 at 3..) Cochise () Cochise's owner was Col. Jesse Johnson, one of the most accomplished soldiers and leaders in the U.S.

12

military, who had conducted Operation Desert Storm as the right hand of General Norman Schwarzkopf. (PA I, Dkt. 216-33 at 32, Brooks Depo. 278:13—279:12.) Cochise's own capability document highlighted a 2003 contract with USACE and USAE to "provid[e] Convoy and Site Security for the Captured Enemy Ammunition program." (PA IV, Dkt. 221-26 at 8; *see also* PA VI, Dkt. 231-1 at 32-33, Irvin Depo. 120:20—121:6 [Cochise's subcontract relationship with USACE was "self-evident"].)

**B.    The Initial Request for Quotations and Cochise's Inclusion in the Process**

On January 18, 2006, Parsons sent a Request for Quotation ("RFQ") to companies with which it had a BOA, which was a pre-approval of a prospective sub-contractor's ability to perform based on its technical and financial capabilities. (PA II, Dkt. 221-19 at 204-11.) The RFQ stated that the:

> Period of Performance for this Subcontract would be mobilization on-site at Camp Victory approximately February 18 2006 and work shall commence immediately through October 31 2006, dependent on the schedule and contract extensions provided to Parsons by their client, the US Army Corps of Engineers. (*Id.*)

Recipients of the RFQ included the security companies Sabre International Security ("Sabre") and ArmorGroup. (RA II, Dkt. 278 at 5.) Cochise did not have a BOA with Parsons on January 18 and, therefore, did not originally receive the RFQ. (*Id.* at 4.)

Only Sabre and ArmorGroup submitted bids, and Parsons canceled the bid process because the bids lacked "competitive range." (PA I, Dkt. 221-18.) On January 24, 2006, Cochise's president contacted Parsons to seek inclusion in the procurement process (RA II, Dkt. 278 at 4.), and at the "insistence and direction" of USACE Project Manager ("PM") Wayne Shaw (PA I, Dkt. 221-18 at 2; PA V, 221-34) the USACE directed that Cochise be added. (PA I, Dkt. 221-18.) Parsons' security manager in Iraq conducted a technical evaluation and approved Cochise for a BOA. (PA V, Dkt. 221-26 at 2.) On February 8, 2006, Parsons then reissued its RFQ to six candidates including Cochise. (PA I, Dkt. 221-18 at 2; PA V, 221-34.)

The bid deadline was February 10, 2006. (*Id.* at Dkt. 221-34.) Only three of the six firms—Sabre, ArmorGroup, and Cochise—submitted bids. (RA II, Dkt. 278 at 5.) Cochise stated it already had personnel on the ground and was ready to deploy before the February 18 start date, while ArmorGroup advised it would need 26 days to mobilize. (*Id.*; PA I, Dkt. 221-3 at 18, ArmorGroup Proposal, § 5.1.3; *id.* at 221-2 at 2.) Sabre was unable to meet a different bid requirement. (PA V, Dkt. 221-25 at 175.)

## C.    USACE's Selection of Cochise

USACE PM Shaw reviewed all three bids and, in a February 11, 2006, email to Parsons that included Relator, concluded that "[a]fter evaluating the proposals

14

submitted for the PSD/Class V convoy missions," it was his "opinion that the contractor that can best accomplish the mission is Cochise Consultancy." (PA V, Dkt. 221-36 at 2.)

Parsons' internal bid evaluation, conducted by Parsons Procurement Manager Hoytt Runnels ("Runnels"), reached a different opinion. (RA II, Dkt. 278 at 6.) He concluded that "[t]he proposal from Armor Group represents a cohesive and best in class proposal, and represents the best value for the government in performance of the assigned missions." (*Id*. at Dkt. 278 at 5-6; PA II, Dkt. 221-19 at 214-18.) In particular, although Parsons noted that Cochise had experience handling Class V and PSD missions for the prior prime contractor, there were concerns about the brevity and cursory nature of Cochise's proposal. (PA II, Dkt. 221-19 at 215.)

USACE rejected Parsons' proposed award to ArmorGroup. (PA I, Dkt. 221-8 at 11, Hiles Depo. 210:8-23.) On February 13, 2006, Runnels acknowledged USACE PM Shaw's endorsement of Cochise, but informed Parsons' project manager for the CMC contract, Gaines Newell ("Newell") that while he "ha[d] no problem with" selecting Cochise, he would "need something more specific ([a] directive) from the client." (PA V, Dkt. 221-37 at 5.) Newell then asked Relator to "get with" USACE, specifically PM Shaw and USACE Contracting Officer Steven Hamilton ("USACE CO Hamilton), to request that USACE "issue

15

[Parsons] a directive" to hire Cochise.  (*Id*. at 4.)

The next day, on February 14, 2006, USACE CO Hamilton issued a directive instructing Parsons to award the subcontract to Cochise:

> Based upon the review of the three proposals submitted to the USACE CMC Program Manager, Cochise is the best qualified to perform the mission. Even though Cochise [*sic*] cost was the highest of the three proposals, the selection was based upon the ability to provide qualified PLS drivers and authorized weapons systems contained in their proposal.
> You re [*sic*] hereby directed to award Cochise the subcontract.

(*Id*. at Dkt. 221-38.)  Thus, USACE rejected Parsons' award to ArmorGroup through this "Hamilton Directive."  (PA I, Dkt. 221-8 at 11, Hiles Dep. 210:8—212:22.)

Certain Parsons employees immediately questioned the wisdom of this directive and balked at accepting it:  First, Runnels forwarded to Hill the "three proposals as received, [Parsons'] internal evaluation and the directive from the client to award to the highest bidder . . . . To make matters worse, the client is insisting a security team be on the ground and ready to go by Feb. 18,20006 [*sic*]."  (PA V, Dkt. 221-40 at 4.)

In response, on February 14, 2006, Parsons' Country Security Manager in Iraq, Guy Irvin ("Irvin"), expressed concerns over the propriety of the Hamilton Directive to award to Cochise.  (*Id.* at Dkt. 221-39 at 2; *id.* at Dkt. 221-40 at 2.) He also recommended documenting Parsons' non-concurrence in case the decision was later scrutinized:

16

> First let me commend [Runnels] on a very thorough and detailed analysis of the submitted bids. I concur with his observations from the technical perspective and although not my purview, his cost analysis as well. Unless we are specifically instructed/ordered by the client to sole source this requirement (in writing) I recommend that ArmorGroup be awarded this contract as they are without question the best value (from the technical point-of-view). ArmorGroup has the necessary experience, proven track record and value added components to make them the clear choice for this solicitation. Given the available information (from the limited bid information provided) Cochise is my last choice. It is my firm recommendation that this contract be awarded to ArmorGroup.

(PA V, Dkt. 221-25 at 291.)

On that same day, Parsons' Global Security Director, Glenn McLea, also made his opposition to the Hamilton Directive clear:

> This whole issue with the security team stinks to high heaven.  Cochise was not included in the original request for quote, they complained to the corp [*sic*] and Dwight reluctantly rebid, adding Cochise.  Cochise comes in with the highest most unacceptable bid and the corp [*sic*] issued a directive to use them.  This should send bells off with some one [*sic*].

(PA III, Dkt. 221-19 at 355.)

Similarly, Parsons' Manager of Procurement, Gary Breslau, explained his skepticism towards the Hamilton Directive: "[i]f the [U.S. Government] directs us in writing to use a particular security provider they are fully liable for the outcome, something that they are not going to like.  However . . . the decision as to who we use for security for our staff [as opposed to USACE or contractor staff] is our decision, and ours alone."  (*Id*. at Dkt. 221-19 at 357.)  Runnels further summarized Parsons employees' objections: "[j]ust so everyone is clear, everyone

17

from the project from Gaines [Newell] down is opposed to the choice made by the corp [*sic*]. Gaines and his group have been nothing but supportive for the procurement dept. and their efforts." (PA V, Dkt. 221-25 at 290.)

On February 15, 2006, Parsons escalated the matter and, through Tim Hiles, Program Manager for Parsons, raised its concerns to USACE Contracting Officer Cheryl Jones in Huntsville, Alabama ("USACE CO Jones"):

> I spoke with Cheryl Jones and she expressed concern with the letter issued by Steve [Hamilton]. Cheryl has taken it to the USACE Office of Counsel and has indicated that they also are concerned with the potential liability to the Government with this kind of direction. The USACE intend to get on a teleconference together in the morning to discuss further. Cheryl has asked that we not proceed with the procurement until the USACE determined their path forward.

(PA V, Dkt. 221-41 at 2.)

There is no evidence in the record stating or even suggesting that Parsons withheld any information about or reasons why Parsons preferred ArmorGroup. Given that every Parsons manager on record opposed the award to Cochise, Parsons lacked any motive to temper its position in the discussion. Two days later, on February 17, 2006, USACE CO Hamilton rescinded his directive to award the contract to Cochise, without providing a reason. (*Id*. at Dkt. 221-42.)

The same day, February 17, 2006,[3] USACE CO Jones emailed USACE CO

---

[3] Hiles testified that he spoke with Jones on February 17. Although it is possible that Jones's email was sent on February 16 (U.S. time) and received on February 17 in Iraq, even that possibility would mean Parsons learned of the Government's

18

Hamilton and PM Shaw, copying a Parsons representative, with the subject line: "Parsons to subcontract with Cochise for Class V and PSD requirement." (PA I, Dkt. 221-4.) USACE CO Jones stated that she had spoken with Parsons [Parsons Program Manager Hiles] twice that day. (*Id*.) In those discussions, USACE CO Jones articulated USACE's desire "to ensure that the CMC got a quality company to perform the critical Class V & PSD convoys." When Parsons proposed re-competing the subcontract, USACE CO Jones responded to Parsons "discussing sending out a new RFP" by asking "them how they planned on getting all this done by [February] 18th and [said] they may want to reconsider their game plan since they have had this requirement since . . . Jan[uary 27th]." (*Id*.) Accordingly, "[t]o expedite the requirement," Parsons informed USACE that it would "sole source" the contract "to Cochise (based on urgency) to meet mission deadlines." (*Id*.)

USACE CO Jones explained that the decision to go with Cochise was based in part on two criteria: "[t]he Government's objective" was "to get a contractor with a good track record to perform the critical Class V and PSD convoys," and the "mission objective" was "getting [a] subcontract in place pronto." (*Id*.). The only security company able to comply with USACE's February 18, 2006, performance requirement was Cochise, given that it had a "full expat" team that had carried out

---

determination less than two full days before performance was to begin. (PA I, Dkt. 221-7, Hiles Dep. 158:2–19, 180–81, 185–86.)

the same missions for the last two years, already had 26 personnel trained and in Iraq ready to perform, and thus able to "provide the required and highly qualified personnel to fulfill the security services and other directed activities to support Parsons and the Corps of Engineers with Class V and PSD security services." (*Id.* at Dkt. 221-2 at 2.) USACE CO Jones' entire email reads as follows:

> **From:** Jones, Cheryl L HNC [mailto:Cheryl.L.Jones@hnd01.usace.army.mil]
> **Sent:** Friday, February 17, 2006 2:32 AM
> **To:** Hamilton, Steven L HNC; Shaw, Wayne L HNC
> **Cc:** Lennon, Lisle E HNC; Tadesse, Lydia B HNC; Sargent, William J HNC; Britton, Robert C HNC
> **Subject:** Parsons to subcontract with Cochise for Class V & PSD requirement
>
> Steve:
>
> Just wanted to fill you all in on my conversation with Tim Hiles (PM for Parsons in HSV) immediately following our conversation this morning and also a subsequent call from Tim this afternoon on Parsons' plan of attack on this action.
>
> The reason we wanted a request for consent to subcontract (which is not contractually required for Parsons since they have a DCAA approved subcontracting system) is that so we could ensure that the CMC program got a quality company to perform the critical Class V & PSD convoys. We discussed this in our negotiations for task order 0010 and told them the reasons. They verbally agreed.
>
> To expedite the requirement, per Tim, Parsons will sole source this to Cochise (based on urgency) to meet mission deadlines. (They were discussing sending out a new RFP and we asked them how they planned on getting all this done by the 18th and they may want to reconsider their game plan since they have had this requirement since mod 01, which was dated 27 Jan.)
>
> FYI: Since there was a bit of legwork involved in getting this to happen by the required date, I verbally agreed that since the Government's objective (to get a contractor with a good track record to perform the critical Class V & PSD convoys) was met and there was no contractual requirement (only a verbal agreement) for them to do a request that Parsons did not need to do a request to consent to subcontract for this action- which would take time away from the mission objective of getting their subcontract in place pronto.
>
> **What this all means is that the approval you are looking for from our end will not materialize but the subcontract should be in place by Sat the 18th.**
>
> If you are hearing differently on that end of the world on Parsons being able to get this subcontract going, please let me know.
>
> Wayne:
>
> Thanks for the blow by blow on what happened on this end. As usual, the communications were less than perfect on this one but I think we will get through it after all.
>
> Cheryl

(*Id.* at Dkt. 221-4 at 2.)

ArmorGroup, in contrast, could not have met the two-day mobilization requirement because, as it had advised Parsons in its proposal, it had zero personnel mobilized. (*Id.* at Dkt. 221-3 at 18, ArmorGroup Proposal, § 5.1.3.) Its

20

proposal stated it would take a minimum of 26 days after the award date to

mobilize its employees to perform the missions because of "a number of hurdles

| Date | Event |
|---|---|
| Prior to award | AG identifies suitable candidates and processes paperwork |
| Award date (A day) | AG initiates mobilisation procedure |
| A Day + 5 | Project Leadership Team Arrives |
| A Day + 6 | Initial Group arrives and begins induction |
| A Day + 16 | Initial Group completes induction and Second Group begins |
| A Day + 26 | Second Group completes induction and team is ready to deploy |

which are outside of our control, badging is one, that can effect [*sic*] mobilisation."

(*Id.*)  ArmorGroup's mobilization chart clearly established its required timeline:

(*Id.*)

### D.    Execution of the Subcontract

On February 18, 2006, the next day after USACE CO Jones memorialized

the decision that Cochise would receive the subcontract, Parsons executed a BOA

with Cochise on a form titled "Subcontract."  (PA I-II, Dkt. 221-15.)  The BOA

between Parsons and Cochise included standard subcontract terms and explicitly

referenced the provision of security services, including those described in the RFQ,

tied to the same Class V and PSD services that were the subject of the subcontract

award.  (*Id*. at Dkt. 221-15 at 8-9.)

Two days later, Parsons issued a Limited Notice to Proceed ("LNTP") to

Cochise to begin contract work pending execution of a formal subcontract. (PA V,

Dkt. 221-25 at 231-32.)  The LNTP was directed to Cochise "to proceed with the

subject work effort in advance of execution of a definitized contract," based on the

21

"unusual and compelling urgency" for logistical convoy support. (*Id*.)  The subcontract was fully executed by February 27, 2006.  (RA II, Dkt. 278 at 8–9.)  Cochise performed under the contract through October 2006.  Newell signed off on an internal memorandum, dated March 11, 2006, with the Subject line: "Memo to File/Sole Source Justification" (the "March 11 Internal Sole Source Memo").  (PA I, Dkt. 221-18 at 2.)  The March 11 Internal Sole Source Memo is a one-page summary of the process and reasoning for sole-sourcing the subcontract to Cochise.  (*Id*.)  It provides in part that:

> Due to the amount of time that had expired through initial and second RFP process Cochise was the only company legitimately capable of mobilizing all personnel within Clients [*sic*] required time frame. Cochise was uniquely qualified in that they were the only firm able to perform within the Clients [*sic*] Standard Operating Procedure and were the only firm familiar with all the CMC locations.  Cochise was the only firm with personnel properly trained to operate the Client provided equipment.

> If the procurement would not have been awarded to Cochise the Client would have suffered substantial financial loss due to idle time, demobilization and remobilization of staff and termination and re-establishing of supporting subcontracts.  If the subcontract was not awarded to Cochise and operations were to continue personnel would have been placed in harms [*sic*] way and could have suffered injury or loss of life.  (*Id*.)

## III.    PROCEDURAL HISTORY

Relator Billy Hunt was the subject of an FBI investigation beginning in 2010 that focused on his receipt of improper benefits and admitted to participating in a kickback scheme related to his work in Iraq, but separate and unrelated to the

Cochise subcontract.  (RA II, Dkt. 278 at 9.)  Relator cooperated with the investigation, pled guilty to federal tax and kickback charges, and was sentenced to 10 months imprisonment.  (*Id*.)

After serving that sentence, Relator filed this FCA lawsuit in 2013 (*id*.) which alleged that Parsons, Cochise, and the USACE engaged in an elaborate bribery, kickback, and gifting scheme.[4]  In his amended complaint, Relator alleged FCA claims based primarily on the same allegations of bribery and violations of the Anti-Kickback Act, with sparse allegations that Parsons failed to engage in full and open competition. (*Id*. at Dkt. 278 at 20-21.)  The parties engaged in lengthy discovery, including depositions of numerous government and Parsons employees. (*Id*. at Dkt. 278 at 10.)  After that process, Defendants brought motions for summary judgment, demonstrating conclusively that there was no bribery; there were no kickbacks; and there were no lavish accommodations or gifts.  (RA I, Dkt. 213; *id*. at Dkt. 220.)  Parsons also demonstrated the propriety of its subcontract award to Cochise.  (*See id*.)  In its opposition – filed *nine years* after Relator sought to have the Department of Justice pursue his ungrounded claims that Parsons had engineered bribery and kickback schemes – Relator remarkably

---

[4] The district court initially dismissed the case based on untimely filing under the statute of limitations, which this Court reversed and which the Supreme Court in turn affirmed.  *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507 (2019).

abandoned those claims.  Relator told the parties and the Court that, instead, it was focusing on whether Parsons had awarded the Cochise subcontract properly.[5]  The district court granted summary judgment in favor of Defendants on all claims in a detailed opinion filed March 19, 2025.  (RA II, Dkt. 278 at 1, 10.)

## IV.    STANDARD OF REVIEW

This Court reviews *de novo* the district court's grant of summary judgment on an FCA claim.  *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).  This Court applies the same standard applied by the district court: summary judgment is appropriate if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.* (cleaned up; quoting Fed. R. Civ. P. 56(a)).

In the context of an FCA claim, summary judgment is proper if the relator fails to raise a genuine dispute of material fact as to any of the required elements, including falsity, scienter (intent), and materiality.  Relator bears the burden to plead—and ultimately prove—each of these elements.[6]  *See United States ex rel.*

---

[5] In Relator's opposition to Parsons' motion for summary judgment, Relator disclaimed his bribery and kickback allegations given the complete lack of evidence identified in support of those claims stating, "Relator is not pursuing the Kickback and/or Bribery allegations."  (RA II, Dkt. 234 at 32.)

[6] Relator cites *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 263 (5th Cir. 2014), for the proposition that Government knowledge is not a standalone defense but rather a way to rebut an assertion of scienter.  (*See* AOB 39-40).  As the Supreme Court recently stated in *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023), FCA liability turns on what the defendant actually

*Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017); *Urquilla-Diaz*, 780 F.3d at 1052.  The FCA's materiality and scienter requirements are "rigorous" and cannot be satisfied by technical noncompliance, innocent mistakes, or *post hoc* disagreement.  *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 195 (2016) ("*Escobar*").  Where, as here, the undisputed record precludes a finding of knowing falsity or material impact on the Government's payment decision, summary judgment must be affirmed.

## SUMMARY OF ARGUMENT

The district court correctly granted summary judgment in favor of Defendants on all claims because the record demonstrates that Parsons acted in good faith and followed the Government's directive to award the subcontract to Cochise.  The district court saw through Relator's attempts to recast the case as one

---

believed at the time it submitted the claim: "The FCA's scienter element refers to respondents' knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *Id*. at 749.  At summary judgment, a party bearing the burden of proof must produce evidence sufficient to create a genuine dispute of material fact on this issue.  Where, as here, the moving party shows an absence of evidence on an essential element—such as scienter— summary judgment is appropriate.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Parsons did exactly that by demonstrating the Government's knowledge and direction of the challenged conduct.  In response, Relator had to "do more than simply show that there is some metaphysical doubt as to the material facts," and instead present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  He failed to do so.

of a fraudulent claim that the subcontract had not been competitively bid.[7]  The

district court also rejected Relator's attempted reliance on after-the-fact "expert"

testimony that sought to restate ArmorGroup's proposal.  As the Supreme Court

confirmed, the FCA imposes liability based on what a defendant actually believed

at the time—not what a relator's expert thinks years later.  *See United States ex rel.*

*Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023).

The Government's knowledge and direction negate both scienter and

materiality.  The record establishes that USACE initiated Cochise's inclusion in

the subcontract process, reviewed all proposals, acknowledged the trade-offs, and

instructed Parsons to make the subcontract award based on operational urgency.

That degree of involvement satisfies the Government knowledge defense

recognized by every circuit to address the issue, including the Eleventh Circuit,

---

[7] Relator's claim fails in the first instance as the competitive bidding requirements
that he relies on in Federal Acquisition Regulation ("FAR"), 48 Code of Federal
Regulations ("C.F.R.") § 6.101, apply only to federal agencies and employees
conducting acquisitions—not to prime contractors like Parsons.  *See* FAR 1.104
("The FAR applies to all acquisitions as defined in Part 2 of the FAR . . . ."); FAR
2.101 ("Acquisition means the acquiring by contract with appropriated funds of
supplies or services (including construction) by and for the use of the federal
government through purchase or lease, whether the supplies or services are already
in existence or must be created, developed, demonstrated, and evaluated.")
(emphasis added).  Contractors are bound only by those FAR provisions that are
expressly incorporated into their contracts, and here, the only relevant clause is
FAR 52.244-5, which requires subcontractor selection on a competitive basis "to
the maximum practical extent."  As a matter of law, Parsons' CMC prime contract
with the USACE did not incorporate 48 C.F.R. § 6.101 and does not govern
Parsons' subcontracting decisions.

which has applied the Supreme Court's teaching that Government knowledge is "strong evidence" of lack of materiality.

Courts routinely reject FCA claims when, as here, the Government knowingly accepted or directed the conduct at issue. Relator's new argument on appeal that Parsons failed to disclose every internal detail is both improper and irrelevant. Not only is Relator's new argument waived, it fails on the merits as the law does not require perfect disclosure; it requires sufficient awareness to negate fraudulent intent. The district court properly held that Relator's claims were reduced to an allegation "that the government was defrauded by the very activities its agents ordered." Dkt. 278 at 15.

Relator's remaining arguments are equally flawed. The LNTP and the March 11 Internal Sole Source Memo upon which Relator relies postdate the subcontract award and were not submitted for payment or reviewed by USACE. These documents cannot satisfy the materiality element. Relator's false certification theory was not pled in the complaint. Alternatively, the claim fails because Relator relies on a form that was submitted by Cochise, not Parsons, and contains no representation regarding compliance with competitive bidding rules (the underlying basis of Relator's FCA case). Relator's conspiracy claim also fails for lack of any evidence of an agreement to defraud the Government and is entirely derivative of his failed substantive theories.

27

After years of litigation and shifting claims, Relator has not identified any false statement, fraudulent conduct, or evidence of intent.  The district court's judgment should be affirmed.

## I.    THE DISTRICT COURT CORRECTLY APPLIED THE GOVERNMENT KNOWLEDGE DEFENSE BASED ON USACE'S DIRECTIVE TO SELECT COCHISE

Relator originally sought to prove a purportedly inextricably intertwined set of alleged misconduct involving the bestowing of illegal gratuities and gifts to a Government official, "subversion" of the competitive bid process, and a conspiracy among the Government official, Cochise, and Parsons to ensure Cochise was selected.  (RA I, Dkt. 118 at ¶ 7).  When confronted with the lack of evidence of a bribe, Relator had to jettison the first component of his theory (which was fatal to the role of the Government official in the supposed conspiracy), leaving only his flimsy allegation regarding lack of competitive bidding that comprised four sentences in his Amended Complaint.  (*See id.*, Dkt. 118 ¶¶ 146-49.)  As the district court properly determined, that claim fails because USACE "not only knew" that Parsons would sole-source the subcontract to Cochise, but "unsubtly directed Parsons to circumvent the normal bid process."  (RA II, Dkt. 278 at 15).  That ruling was correct.

28

A.    **Government Knowledge Negates Scienter and Materiality Under Established Precedent**

Government knowledge and approval of the Government claim at issue negates the fraud or falsity required to establish the first element of an FCA violation.  Eight federal circuits recognize this principle, holding that when the Government is aware of the underlying facts and either acquiesces or directs the conduct in question, the scienter necessary for FCA liability is lacking.  *See*, e.g., *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993); *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 755 (3d Cir. 2017) ("[T]he government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation") (cleaned up); *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002); *United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 380 (5th Cir. 2017) ("[T]here is no scienter when the defendant knows—not just that the statements are false—but that the government knows that the statements are false"); *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 544–45 (7th Cir. 1999) ("[I]f the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim"); *United States ex rel. Costner v. United States*, 317 F.3d 883, 887 (8th Cir. 2003); *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th

29

Cir. 1991) ("*Hagood*"); *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir. 2000).  As the Tenth Circuit summarized, "[t]he 'government knowledge inference' helps distinguish, in FCA cases, between the submission of a false claim and the knowing submission of a false claim—that is, between the presence and absence of scienter."  *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 951 (10th Cir. 2008) (emphasis in original).

Leading FCA scholar John T. Boese endorses the Government knowledge defense.  Boese explains that "[a] 'government knowledge' defense will be strengthened when the government's representative does not merely 'know' about (and impliedly consent to) submission of a false claim, but affirmatively instructs the contractor to submit the claim, notwithstanding any surrounding problems." J. Boese, *Civil False Claims and Qui Tam Actions* § 2.03[F][3] (4th ed. 2011).

The Government's knowledge and direction of the conduct also negates materiality.  The Supreme Court has made clear that "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195.  This Court has applied this standard as well, holding that the relator failed to establish materiality where "[t]here was no evidence . . . that the state refused reimbursement or sought recoupment" after becoming aware of the alleged violation.  *Ruckh v. Salus Rehabilitation, LLC*, 963 F.3d 1089, 1109

30

(11th Cir. 2020); *see also United States ex rel. Bibby v. Mortgage Inv'rs Corp.*, 987 F.3d 1340, 1350 (11th Cir. 2021) (when "the [Government] had actual knowledge of [the defendant's] noncompliance during the relevant time frame," that knowledge may weigh against proof of materiality).  At least eight other Circuits are in accord.  *See D'Agostino v. cv3, Inc.*, 845 F.3d 1, 7 (1st Cir. 2016) ("The fact that CMS has not denied reimbursement . . . in the wake of [relator's] allegations casts serious doubt on the materiality of the fraudulent representations that [relator]"; also holding no causation); *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 118 (2d Cir. 2021) (Government payment of claims despite "actual knowledge of AECOM's non-compliance with the MHU rate and failure to properly track government property . . . provides ample evidence that the MHU rate and tracking of government property requirements were not plausibly material to the government's payment decision."); *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490 (3d Cir. 2017) (Government inaction after relator's disclosure demonstrated lack of materiality); *United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 663-64 (5th Cir. 2017) (reversing judgment for failure to prove materiality in light of "continued payment by the federal government after it learns of the alleged fraud" and when it "has never retracted its explicit approval"); *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 828, 831 (7th Cir. 2011) (cited in *Thomas*); *United States ex rel. Kelly v.*

31

*Serco, Inc.*, 846 F.3d 325, 334 (9th Cir. 2017) ("Given the demanding standard required for materiality under the FCA, the government's acceptance of Serco's reports despite their non-compliance . . . and the government's payment of Serco's public vouchers for its work . . ., we conclude that no reasonable jury could return a verdict for Kelly on his implied false certification claim."); *United States ex rel. Thomas v. Black and Veatch*, 820 F.3d 1162, 1173 (10th Cir. 2016) (courts have found "evidence of the government's inaction after learning of alleged violations sufficient to establish the lack of materiality"); *United States ex rel. McBridge v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017) ("we have the benefit of hindsight and should not ignore what actually occurred: the DCAA investigated McBride's allegations and did not disallow any charged costs. . . . This is 'very strong evidence' that the requirements allegedly violated by the maintenance of inflated headcounts are not material"; citing *Escobar*).

The Government knowledge defense applies with full force here. Government knowledge of, and participation in, all the relevant facts undermines the inference of fraudulent intent. *See United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 954 (10th Cir. 2008) (defense applies where "government's knowledge or cooperation with a contractor's actions is so extensive that the contractor could not as a matter of law possess the requisite state of mind"). The Government's involvement here went beyond mere awareness—it directed the

32

sole-source award to Cochise, acknowledged the trade-offs, and emphasized the importance of timeline compliance to operational safety in an active war zone. This is not a case of contractor deception; it is one of contractor adherence to Government directive to save lives.

As for materiality, the Second Circuit in *Foreman* has identified the following relevant factors:  "(1) whether the government expressly designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment; (2) the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision; and (3) whether the defendants' alleged noncompliance was "minor or insubstantial."  19 F.4th at 110. CO Jones' email establishes evidence of all these factors:  (1) CO Jones made clear there was no time to go through a second bid process, (2) CO Jones expressly referenced a sole-source award to Cochise, and (3) the alleged noncompliance was not only not "minor or insubstantial" but was exactly what USACE wanted. Relator failed to show materiality. (PA I, Dkt. 221-4 at 2.)

## B.   Relator's New Disclosure Claim Was Not Preserved and Fails on the Merits

Relator argues for the first time that Parsons must "unambiguously demonstrate" that it "provided complete, accurate, truthful, and particularized factual information" to avail itself of the Government knowledge defense.  (AOB 38-42).  Relator never made any such argument in its motion papers in the district

33

court, much less any such claim in its amended complaint.  Instead, Relator argued in the district court only that USACE never actually instructed Parsons to select Cochise or, alternatively, never limited Parsons' discretion such that it had to select Cochise.  (RA II, Dkt. 234 at 21-28).  Accordingly, this Court should not consider Relator's new argument given his failure to raise it in the district court.[8]

In any case, the district court properly found that the record did not present any genuine issue as to Government knowledge when it granted summary judgment.  In this instance, the Government was in possession of all three bids.  Further, during a meeting in Huntsville with the personnel who supervised USACE's contracting group in Iraq, Parsons made the USACE's Headquarters aware of Parsons' strong desire to select ArmorGroup.  Relator appears to suggest that Parsons was required to provide a more formal briefing to USACE, perhaps with detailed citation to the e-mails that stated Parsons' specific internal analysis

---

[8] This Court has "repeatedly held that 'an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court.'"  *See Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (citing *Walker v. Jones*, 10 F.3d 1569, 1572 (11th Cir.1994) (quoting *Depree v. Thomas*, 946 F.2d 784, 793 (11th Cir.1991)); *see also Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1222 n. 8 (11th Cir.2004) ("The district court was not presented with and did not resolve an equal protection argument based on Surfside's treatment of private clubs and lodges.  Therefore, we will not consider this argument on appeal."); *Hurley v. Moore*, 233 F.3d 1295, 1297 (11th Cir.2000) ("Arguments raised for the first time on appeal are not properly before this Court.").

underlying its articulated recommendation, to rely upon the Government knowledge defense.  That position is not supported by the case law.

When evaluating a contractor's acts in compliance with a Government directive beyond the original wording of the contract, "the fact that government officials knew of the contractor's actions may show that the contract has been modified or that its intent has been clarified, and therefore that the claim submitted by the contractor was not 'false.'"  *Kreindler & Kreindler*, 985 F.2d at 1157.  In that circumstance, the fact that Parsons "did merely what the Corps bid it do" demonstrates that it "did not submit its claim in deliberate ignorance or reckless disregard of the truth."  *Hagood*, 929 F.2d at 1421; *see also U.S. ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 454 n.21 (6th Cir. 2005) (*Kreindler & Kreindler* and *Hagood* "involved situations in which the government's knowledge was used to demonstrate that what the defendant submitted was not actually false but rather conformed to a modified agreement with the Government").  Here, it is the Government's instructions that matter; none of these cases require the contractor to rebut the Government's modified intent or otherwise seek to bring additional materials to the Government's attention.

Judge Jones of the Fifth Circuit has observed that "[w]here the government and a contractor have been working together, albeit outside the written provisions of the contract, to reach a common solution to a problem, no [FCA] claim arises."

35

*United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (*en banc*) (E. Jones, J., concurring). That is exactly the situation before the Court here. After USACE ordered Parsons to hire Cochise following its review of the proposals, Parsons identified an issue with USACE's Hamilton Directive and worked together with USACE CO Jones to arrive at a "common solution." Defendant's own authority similarly makes clear that "the government knowledge inference is well-suited to the facts of this case, where both governmental knowledge and governmental cooperation are present." *Burlbaw v. Orenduff*, 548 F.3d 931, 953 (10th Cir. 2008). Thus, Relator cannot state an FCA claim.

The case law does not require that Parsons must also reveal its internal analyses when the Government, having reviewed the bids submitted, and having been made aware of its contractor's recommendation, nonetheless directs that a different, particular action be taken.[9] In any case, the Government was aware of all

---

[9] In any case, the caselaw in other contexts does not demand such a disclosure. Relator's own authority states that the relevant inquiry is whether "the allegations of fraud were *sufficiently* disclosed to the government." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 23 (2d Cir. 2016) (citing *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 600 F.3d 319, 332 (4th Cir. 2010) (emphasis added). Thus, a defendant's disclosures that, in the view of Relator, were a "whitewash," can be sufficient. *United States ex rel. Ritchie v. Lockheed Marin Corp.*, 558 F.3d 1161, 1170 (10th Cir. 2009) (cited in *Ladas*, 824 F.3d at 23-24). *See also United States ex rel. Jackson v. University of North Texas*, No. 4:13-CV-734, 2016 WL 369693 at *4 (E.D. Tex. Feb. 1, 2016) ("Further, courts have rejected the argument that the government must have "full knowledge of the scope of the fraud" at the time a pre-filing release is signed by a relator in order to find

36

the relevant facts.  The Government endorsed Cochise's capabilities, based on its familiarity with Cochise's services for the past two years.  It directed Parsons to issue its RFQ to Cochise.  (PA I, Dkt. 221-18 at 2.)  USACE received and reviewed all three bid proposals.  (PA V, Dkt. 221-36.)  USACE ultimately relied on Cochise's experience.  (PA I, Dkt. 221-18 at 2.)  Cochise noted that experience in its proposal to Parsons' wherein it confirmed that Cochise had provided the same services in Iraq for two years to USA Environmental.  (RA I, Dkt. 220 at 5; PA V, Dkt. 221-26 at 8).

---

the government had sufficient information to investigate the allegations"; citing *Ritchie*).

In contrast, cases discussing "full knowledge" on the part of the government illustrate only one of a number of ways by which government knowledge can defeat an FCA claim.  *See United States ex rel. Ubl v. IIF Data Solutions*, 650 F.3d 445, 453 (4th Cir. 2011)  ("*[f]or example*, if the government with full knowledge of the relevant facts directed a contractor to file a claim that was later challenged as false, the fact that the contractor did what the government told it to do would go a long way towards establishing that the contractor did not knowingly file a claim known to be false.") (emphasis added); *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321 (9th Cir. 1995) ("[t]hat a defendant has disclosed all the underlying facts to the government *may . . .* show that the defendant had no intent to deceive . . .") (emphasis added; cleaned up).  Relator's reliance on *Temple v. Sigmatech, Inc.*, No. 5:13-cv-44, 2015 WL 1486986 (N.D. Ala. Mar. 30, 2015), is also unavailing, because the court there deemed the record insufficiently developed on a motion to dismiss as to the extent of the government's knowledge of certain billing practices. That case presents a different procedural and factual situation than the summary judgment record regarding the evaluation of bid proposals here.  In any case, as discussed in the text, the government had all the information it required to make its decision.

37

Based on that and other information in Cochise's proposal, as well as comparison with the other two proposals it had in hand, USACE PM Shaw wanted Parsons to hire Cochise, despite Parsons' selection of ArmorGroup.  (*Id*. at Dkt. 221-36 at 2.)  USACE CO Hamilton subsequently issued the Hamilton Directive that required Parsons to subcontract with Cochise.  (*Id*. at Dkt. 221-38 at 2.) The Hamilton Directive itself recognizes that Cochise's cost was the highest of the three proposals, so that it cannot be reasonably argued that USACE did not review the proposals.  (RA I, Dkt. 220 at 6; PA V, Dkt. 221-38 at 2 [***"Based upon the review of the three proposals submitted to the USACE CMC Program Manager, Cochise is the best qualified to perform the mission.  Even though Cochise cost was the highest of the three proposals, the selection was based upon the ability to provide qualified PLS drivers and authorized weapons systems contained in their proposal."***] (emphasis added); *id.*at Dkt. 221-14 at 7, Hamilton Depo. 21:16-25 ["Well [Shaw] could have [given his recommendation on what subcontractor should perform], but it should have been in the process of a contractor evaluation . . . when they had the boards and all.  That's when he should have given his recommendation."]).  (RA II, Dkt. 278 at 6 [citing PA V, Dkt. 221-38]).  Finally, USACE CO Jones made clear of the urgency involved in its choice of Cochise to "ensure that the CMC program got a quality company to perform the critical Class V & PSD convoys" and agreed with a sole-source award "[t]o expedite the

requirement." (PA I, Dkt. 221-4 at 2.) These facts, all confirmed by the district court, demonstrate that USACE was not merely aware of the relevant facts—it actively directed the result. (*See* RA II, Dkt. 278 at 14–15.) Thus, despite its preference for ArmorGroup, Parsons followed the Government's directive and awarded the subcontract to Cochise. As the district court properly concluded, "Hunt's complaint is reduced to an 'allegation that the government was defrauded by the very activities its agents ordered.'" (*Id*. at Dkt. 278 at 15.)

It was immaterial whether Parsons shared its written reviews with the USACE supervisors' personnel when it brought the Hamilton Directive to their attention. Parsons was uncomfortable with the Hamilton Directive. Parsons wanted to hire ArmorGroup, not Cochise. There were no divergent views – Parsons' most senior and junior staff members held that position. Every fact established in the record underscores that. Parsons had no reason, incentive, or rationale to pull punches. Further, the documents identified by Relator contain no new information that could have influenced the Government's firmly held decision that Cochise should perform the subcontract.

Parsons was entitled to rely on USACE's actions and directives. The district court properly granted summary judgment based on the Government's action. Even if the Government's direction of the process was unusual, it was the Government's insistence on this result that establishes the lack of materiality. The

39

Supreme Court cautioned against FCA liability based on "garden-variety breaches of contract or regulatory violations," especially where the Government proceeds with payment despite full knowledge of the alleged noncompliance. *Escobar*, 579 U.S. at 194–95.[10]  Here, USACE directed the sole-source award to Cochise with full knowledge of the circumstances.  Relator's process critique is legally irrelevant.

On appeal, Relator attempts to undercut the contemporaneous record by relying on his expert, Robert Linsmier, who now claims that – contrary to ArmorGroup's written proposal, ***which Linsmier had prepared*** --  ArmorGroup could have met the February 18 mobilization deadline.  But this argument is a red herring for two independent reasons.[11]  First, there is no evidence in the record that Parsons knew ArmorGroup could start 24 days earlier than ArmorGroup had claimed in its proposal. If that had been true, Linsmier could have put that in the proposal when he drafted it, but he did not. (PA I, Dkt. 219-1, Linsmier Report

---

[10] Having failed to establish scienter or materiality, Relator is left with at most a claim for breach of contract, which is not a basis for FCA liability. *See, e.g., Yannacopoulos*, 652 F.3d at 824 ("[A] mere breach of contract does not give rise to liability under the False Claims Act. . . . Nor do mere differences in interpretation growing out of a disputed legal question involving the terms of a contract.").

[11] Relator proffered Linsmier as an expert witness to provide his evaluation of the merits of ArmorGroup's proposal.  In fact, Linsmier was the ArmorGroup official who prepared that proposal, and it was because of that dual role that Parsons moved *in limine* to exclude his testimony.  (PA I, Dkt. 219).  The district court denied this motion as moot in light of the grant of summary judgment, but the reasons cited in the motion pertain to Relator's attempt to revive his barred claim.

(Dkt. 219-1) at ¶¶ 4, 7, 8, 10-16.) Second, Parsons ultimately followed USACE's directive to award the subcontract to Cochise, despite having raised internal objections and concerns about Cochise's qualifications. Parsons did not select Cochise unilaterally—it complied with the Government's explicit instruction, which defeats any inference of fraudulent intent.

Relator relies on *post hoc*, revisionist testimony, but the undisputed contemporaneous record confirms that ArmorGroup informed Parsons in its proposal that required 26 days to mobilize, and included language that it could not meet the February 18 deployment deadline. As the district court correctly held, this written representation by ArmorGroup undermines any suggestion that Parsons acted with the scienter necessary to support an FCA claim. The Court concluded that Parsons' reliance on ArmorGroup's contemporaneous representations about its readiness was both reasonable and uncontradicted by any evidence in the record. (RA II, Dkt. 278 at 5–6.)

## C.    *Schutte* Forecloses Relator's Scienter Argument

In *Schutte*, the Supreme Court unanimously rejected exactly what Relator is trying to do in this case—*i.e.*, inject after-the-fact information to attack Parsons' conduct. The Supreme Court has made it abundantly clear that "the FCA's scienter element refers to a defendant's knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." 508 U.S. at

41

749.  Thus, liability under the FCA attaches only when the defendant (1) had actual knowledge, (2) acted in deliberate ignorance of the truth, or (3) acted in reckless disregard of the truth or falsity of the claim.  *Id*. at 750; *see also* 31 U.S.C. § 3729(b)(1)(A).

Under *Schutte*, the proper focus is what Parsons actually believed when it selected Cochise as the subcontractor—not what an expert witness or competing contractor might think in hindsight.  The record shows that Parsons reasonably believed, based on bid submissions and vendor representations, that ArmorGroup could not meet the February 18 deployment schedule.  Parsons' internal documentation reflects this conclusion, and USACE's insistence on meeting the February 18 deadline further shaped its decision.  (RA II, Dkt. 278 at 5–6.) They do not.

*Schutte* also makes clear that mere negligence, flawed judgment, or procedural missteps do not establish scienter under the FCA.  The Court emphasized that scienter must reflect a culpable state of mind—"a defendant's conscious belief that his claims are false."  *Id*. at 750–51.  Parsons' defensible decision to comply with a Government directive falls far short of that threshold.  The company initiated a competitive bid process, reevaluated when USACE directed it to include Cochise, documented concerns about Cochise's qualifications, and elevated those concerns to USACE CO Cheryl Jones.  Only

42

after USACE reaffirmed the urgent timeline and directed the award did Parsons proceed. (RA II, Dkt. 278 at 7–8.) Compliance under operational duress is not fraud.

Moreover, the Supreme Court expressly rejected the view that ambiguity in a contract or regulation creates a blanket "safe harbor" against scienter. Even when terms are unclear—such as "usual and customary" in *Schutte*—what matters is whether the defendant subjectively believed the information presented to it or the view it took. *See id*. at 752. Just as FCA liability could attach in *Schutte* where the defendants believed their pricing was improper, it cannot attach here where Parsons believed that ArmorGroup could not meet the schedule and where the Government itself directed the sole-source award to Cochise. The FCA does not punish adherence to Government instructions merely because someone later second-guesses the decision.

In short, the FCA targets actual fraud—not mistaken choices, imperfect procurement procedures, or judgment calls made in good faith. The record leaves no room for doubt that Parsons believed ArmorGroup could not deploy in time, and that USACE required an immediate solution. Acting on that belief, Parsons followed the Government's directive. Under *Schutte*, that belief forecloses any finding of scienter. The district court granted summary judgment, and its decision should be affirmed. *See Schutte*, 598 U.S. at 751–52; Dkt. 278 at 15.

43

**D.    Even if Government Knowledge Somehow Did Not Resolve Relator's Subsidiary Claims, Each of Those Claims Must Fail**

Relator claims that there was no factual or legal basis for Parsons to issue a sole-source subcontract award to Cochise (AOB 42-48), that Parsons created "fraudulent documents" for that sole-source award (*id*. at 48-50), and that Defendants avoided competitive bidding of the subcontract. (*Id*. at 51-53). All these interrelated claims fail for the same reason discussed above, that is, USACE directed Parsons to make an award to Cochise that could only be made on a sole-source basis.[12] As for the documents at issue, those were issued after the subcontract was awarded. Finally, the record shows that, given USACE's directive and restrictions on Parsons' authority, a sole-source award to Cochise was the only possible decision.

### 1.    Government Knowledge is Fatal to Relator's Attack on the Sole-Sourcing of the Subcontract

This claim is simply a reformulation of Relator's initial argument with a focus on that aspect of the award involving a sole-source of the subcontract to Cochise. (AOB at 42-48). As discussed above, courts "decline to hold [the defendant] liable for defrauding the government by following the government's

---

[12] Indeed, the Second Circuit disposed of a relator's similar attempt to portray a portion of his claim as "distinct" from the balance of his claim, by noting that all of the claims rest on the same alleged violations of the contract at issue and fail for the same reason that those other claims failed. *Foreman*, 19 F.4th at 118 n.9. The same is true here.

44

explicit directions." *See Durcholz*, 189 F.3d 542 at 545. The Government's directions left Parsons with only one alternative, which was to award the subcontract to Cochise on a sole-source basis. As the district court held, USACE was not only aware of Parsons' evaluation but affirmatively instructed Parsons to award the subcontract to Cochise, knowing that it was the higher-cost bidder and despite the concerns about bypassing the conventional competition timeline. (RA II, Dkt. 278 at 6–8.) Once the Government declared that it prioritized speed of deployment over a more prolonged competitive selection, Parsons complied. That compliance cannot serve as the basis for FCA liability.

Relator's attempt to establish FCA liability based on an LNTP and the March 11 Internal Sole Source Memo fails as a matter of law and fact. As a matter of fact, neither document states anything false. As a matter of law, as the district court correctly found, Parsons created both documents after Parsons had awarded the subcontract to Cochise and submitted neither to the Government as part of a claim for payment. Accordingly, as the district court concluded, they "could not have influenced the Government's payment decision." (*Id*. at Dkt. 278 at 17–18.)

> 2. Relator's Attack on the LNTP and the March 11 Internal Sole Source Memo Fail Because They Postdated the Award and Were Not Part of a Payment Claim

As for Relator's attack on the LNTP and the March 11 Internal Sole Source Memo (AOB 48-50), as the district court held, these documents were executed

only after USACE had already directed Parsons to proceed with Cochise.  There is no evidence that either document was reviewed by USACE decision-makers or played any role in the Government's award or payment decision.  Materiality under the FCA requires a misrepresentation that has a "natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property." *Escobar*, 579 U.S. at 192–93 (2016).  Relator fails to identify any evidence that USACE reviewed or relied on the LNTP or March 11 Internal Sole Source Memo.  This omission is fatal.  Post-*Escobar* FCA claims require proof that the alleged misrepresentation actually influenced the Government's payment decision. *Marsteller*, 880 F.3d at 1313.  Here, USACE made the award knowing the contents of the bids, the urgency of the timeline, the need to sole-source the subcontract to Cochise, and Parsons' objections—none of which hinged on the documents Relator now cites.  Relator's false records claim fails as a matter of law because neither the LNTP nor the March 11 Internal Sole Source citing FAR § 6.302-2(b) was material to the Government's payment decision.  As the district court correctly held, both documents postdated the selection of Cochise as the subcontractor and were never submitted to the Government as part of any claim for payment.  (RA II, Dkt. 278 at 17–18.)  The FCA's materiality standard is "rigorous" and requires more than the theoretical possibility that a statement could affect agency action—it demands evidence that the misrepresentation had a natural tendency to influence, or was

46

capable of influencing, the actual decision to pay.  *Escobar*, 579 U.S. at 192–93.

Here, the Government had already selected Cochise, fully aware of Parsons' concerns and the procurement process, before the LNTP and the March 11 Internal Sole Source Memo were even generated.  Relator points to no evidence that these documents were relied upon by the Government or connected in any way to a payment request.  Moreover, Relator's claims rest on unfounded speculation.  He offers no evidence that the Government's payment decision would have been different had it reviewed the LNTP or the March 11 Internal Sole Source Memo— nor could he, as the evidence in the record confirms that the Government was already aware of the key facts and considerations reflected in these documents at the time of the Government's directive on February 18.

Relator's reliance on *United States v. Triple Canopy, Inc.*, 775 F.3d 628 (4th Cir. 2015), is misplaced.  Initially, the Supreme Court subsequently vacated and remanded the matter for further consideration in light of *Escobar*.  *See Triple Canopy, Inc. v. United States ex rel. Badr*, 579 U.S. 924 (2016).  Moreover, even if *Triple Canopy* were binding precedent (which it is not), the facts of that case are entirely distinguishable.  In *Triple Canopy*, the contractor created falsified firearms qualification records that were part of the contract performance file and were fabricated evidence of compliance with contract terms tied to payment.  *Triple Canopy, Inc.*, 775 F.3d at 638–40.

Relator's reliance on *Feldman v. Van Gorp*, 697 F.3d 78 (2d Cir. 2012), is also misplaced. *Feldman* involved detailed and repeated misrepresentations in materials submitted to the National Institutes of Health ("NIH") for ongoing federal grant funding. *Feldman* held there was sufficient evidence of materiality because (1) the parties stipulated that grantees were required to submit progress reports describing changes in personnel and curriculum as a condition of continued funding; (2) the NIH's published renewal instructions stated that such reports were essential for "assess[ing] changes in scope or research objectives," and for agency planning and reporting; and (3) there was extensive documentary and testimonial evidence showing that the defendants withheld information about substantial changes to the program. *Id*. at 95–97. The *Feldman* court ruled that materiality "does not require evidence that a program officer relied upon the specific falsehoods proven to have been false in each case in order for them to be material." The court held that a reasonable jury could conclude these omissions were objectively material because they had a "natural tendency to influence" the agency's funding decision, even if no specific NIH official testified to subjective reliance.

Relator's reliance on *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016), is also misplaced. In this case, the court found that Kmart's pricing representations were material because they directly influenced the amount

of federal reimbursement it received, and Kmart knowingly withheld lower "usual and customary" pricing data that it used for nearly all cash-paying customers. The court emphasized that Kmart's misstatements concerned the central pricing term on which Medicare payments were based, and that substantial evidence—including expert testimony and internal documents—showed Kmart structured its programs to avoid disclosing that information.

No such facts exist here. The LNTP and the March 11 Internal Sole Source Memo were internal, post-award documents that were not submitted to the Government, not required by contract, and not tied to any payment obligation. Further, they simply memorialized what all of the parties already knew. Unlike *Triple Canopy*, *Feldman,* and *Garbe* there is no evidence that Parsons created these records to substantiate a claim, conceal noncompliance, or disguise any practice affecting payment. Rather, as the district court noted, they served routine administrative functions after the Government had already directed the subcontract award. (Dkt. 278 at 17–19.)

Moreover, Relator improperly attempts to collapse § 3729(a)(1)(A)'s presentment requirement into § 3729(a)(1)(B), contrary to Eleventh Circuit precedent. While § 3729(a)(1)(B) does not require presentment *per se*, materiality under that provision still demands a link between the allegedly false record and the Government's decision to pay. *See Escobar*, 579 U.S. at 192. The documents

49

cited by Relator were not part of any claim, were not relied upon, and had no bearing on the Government's pre-existing decision to proceed with Cochise. At most, they reflected Parsons' memorialization of a decision already made by USACE. Accordingly, the district court correctly held that Relator failed to establish materiality under § 3729(a)(1)(B), and summary judgment was proper.

Relator cannot reasonably characterize the LNTP as a false record. Moreover, it was not a certification, invoice, or final subcontract; as stated above, it was a temporary authorization issued under FAR 16.603 to allow work to begin while the subcontract was being finalized. *See* Dkt. 278 at 18–19. Parsons issued the LNTP on February 20, 2006, and finalized the subcontract with Cochise shortly thereafter. There is no evidence that the LNTP was submitted to the Government for review or payment, or that it misrepresented anything relevant to procurement compliance, much less that it was part of a fraudulent scheme to make a false statement to the Government.

### 3. The Record Demonstrates that the "Urgent and Compelling" Need Came from the Government

Relator argues that the district court erred granting summary judgment on Count IV because Defendants purportedly circumvented "the CMC Contract's requirement that subcontracts be competitively bid by fabricating an unusual and compelling urgency to justify sole-sourcing the Security Subcontract to Cochise." (AOB 51.) Parsons' CMC contract required Parsons to make subcontract awards

50

in accordance with FAR 52.244-5, which requires subcontractor selection on a competitive basis "to the maximum practical extent."[13]  The totality of facts demonstrate conclusively that Parsons' meticulous conduct exceeded this requirement.

Moreover, as discussed above, the record shows that there was an "unusual and compelling urgency" to justify the sole-source award to Cochise.  Parsons sought to conduct a competitive bidding process, but USACE's direction of the award with the Hamilton Directive and Parsons engagement with USACE resulted in USACE providing a second directive from CO Jones that left Parsons no time to conduct another competitive bidding process.  As the district court correctly held, it was the USACE, not Parsons, that imposed the accelerated schedule requiring full deployment by February 18, 2006.  The district court concluded, based on undisputed evidence, that "[t]he urgency was created by the government's own operational timelines, not by any misconduct on Parsons' part" (RA II, Dkt. 278 at 14).  USACE's insistence on this timeline—and its rejection of any delay—was the key factor shaping the procurement outcome.

---

[13] Initially, as discussed above in footnote 6, Parsons is not subject to the purported competitive bidding requirement of FAR § 6.101.

> 4.     The District Court Correctly Rejected Relator's Unsupported
> False Certification Theory Based on Standard Form 1034

Relator claims that the district court improperly dismissed Count IV of the amended complaint because he had properly alleged that Parsons certified that it had complied with the competitive billing requirement when it billed the Government.  (AOB 51-52).  Relator, however, misapprehends the district court's order, in that the court held that this claim could only have been based on a Standard Form 1034, which Relator identified for the first time in opposing the motions for summary judgment.

Relator's false certification theory is both procedurally barred and substantively meritless.  Relator did not plead this theory in the operative complaint.  Relator admittedly raised it for the first time in opposition to summary judgment.  As the district court correctly held, "[Relator] never alleges a false certification claim in his amended complaint, so the Court will not consider this theory now."  (RA II, Dkt. 278 at 21.)  That ruling is consistent with this court's established precedent that precludes a party from amending its complaint through summary judgment briefing.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

In any event, even if properly raised, the district court correctly rejected the claim on the merits.  The Standard Form 1034 at issue was submitted by Cochise— not Parsons—and it contains no express or implied representation by Parsons

52

regarding compliance with any subcontracting or procurement procedures.  (RA II, Dkt. 278 at 23.)  The form simply documents incurred costs.  It does not have any certification language.  As the Supreme Court held in *Escobar*, implied certification liability arises only when a claim makes "specific representations about the goods or services provided" that are misleading due to the omission of material legal or contractual violations.  579 U.S. at 190.  Here, there is no such representation, and no evidence that the Government relied on the form or understood it to certify compliance with competitive bidding requirements. Finally, even aside from this reason, as discussed in argument Section I above, this claim fails because Parsons acted at the Government's direction.  Relator's theory is therefore both untimely and legally deficient.

     5.    <u>The District Court Correctly Rejected Relator's Argument That Parsons Committed Fraud When It Did Not Perform a Second Competition</u>

As for Relator's claim that the regulations required Parsons to re-compete the subcontract after issuing the LNTP (AOB 25), the district court properly rejected that claim as both factually and legally unfounded.  As the district court held, Parsons executed a detailed and final subcontract with Cochise on or before February 27—prior to the expiration of the LNTP.  Because a final subcontract was executed within the expected timeframe, the LNTP served its intended transitional purpose, and "[n]o additional LNTP was issued" because none was

required.  (RA II, Dkt. 278 at 18–19.).  Relator's suggestion that a second competitive process was mandatory finds no support in the FAR or any other legal authority.

As stated above in footnote 4, Relator also attempts to impose procurement requirements derived from statutes and FAR provisions that apply only to federal agencies—not to private contractors operating under a cost-reimbursement prime contract.  Parsons, as a contractor, is governed by the FAR only to the extent those provisions are incorporated into its prime contract or otherwise required by the Government.  The district court correctly held that Relator "does not explain how these laws apply to Parsons" in this context, particularly since he has abandoned his original theory that the award to Cochise was the result of bribery.  (RA II, Dkt. 278 at 21–22.).  Absent such a theory, Relator's reliance on procurement standards applicable to USACE does not create a legal duty enforceable against Parsons under the FCA.

The FAR does not require a private contractor to re-compete a subcontract simply because an LNTP was used as a bridge to a final subcontract award.  FAR 16.603 expressly permits the use of letter contracts or LNTPs in urgent circumstances, and nothing in the regulatory framework mandates a second round of bidding once a final contract is executed.  Parsons issued the LNTP consistent with that authority and then finalized the subcontract shortly thereafter.

54

Accordingly, the district court correctly rejected this theory of liability. Relator's argument imposes a duty neither found in the governing regulations nor supported by the facts. Summary judgment was properly granted, and the judgment should be affirmed.

## II. THE DISTRICT COURT PROPERLY REJECTED RELATOR'S CONSPIRACY CLAIM BECAUSE THERE IS NO GENUINE ISSUE OF MATERIAL FACT WITH RESPECT TO HIS UNDERLYING FCA CLAIMS

To prevail on a conspiracy claim under 31 U.S.C. § 3729(a)(1)(C), a relator must prove that: (1) the defendant conspired with one or more persons to get a false or fraudulent claim paid by the Government, and (2) one or more conspirators performed an overt act in furtherance of the conspiracy. *See United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 126 (D.C. Cir. 2015). The statute requires proof of "a specific intent to defraud the government," and courts have emphasized that "general business dealings or shared interests are not enough." *United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 50 (1st Cir. 2009).

Relator's conspiracy claim in Count II of his amended complaint fails as a matter of law because he offers no evidence of an agreement between Parsons and Cochise to defraud the Government, and because the claim is entirely derivative of his failed FCA theories. As the district court correctly held, "[w]ithout an underlying FCA violation, Hunt's conspiracy claim must fail" (Dkt. 278 at 28). *See In re Shelton*, No. 11-12075, 481 Fed. Appx. 520, 524 (11th Cir. July 3, 2012)

55

( "a civil conspiracy cannot exist in the absence of an underlying tort") (cleaned up); *McCarthy v. Kleindienst*, 741 F.2d 1406, 1413 n.7 (D.C. Cir. 1984) (conspiracy allegations "are sustainable only after an underlying tort claim has been established"); *United States ex rel. Marsteller v.* Tilton, 556 F. Supp. 3d 1291, 1317 (N.D. Ala.).  In any event, for the reasons stated above, including the facts establishing Government knowledge, the conspiracy claim fails.

## III.    CONCLUSION

For the reasons stated above, defendant Parsons respectfully requests that this Court affirm the judgment of the district court.

Dated:    August 18, 2025          PILLSBURY WINTHROP SHAW
PITTMAN LLP


By:    */s/ Aaron S. Dyer*
    Aaron S. Dyer
    Ronald L. Cheng
    Derek M. Mayor
    725 South Figueroa St., 36th Floor
    Los Angeles, California 90017-5524
    Telephone:  (213) 488-7100
    Facsimile:   (213) 629-1033

    Loftin Holt Hall & Hargett LLP
    G. Bartley Loftin, III
    Angela M. Schaefer
    200 Clinton Ave. W Suite 405
    Huntsville, Alabama 35801
    Telephone:  (256) 929-7997
    Facsimile:   (256) 381-4449

    Attorneys for Defendant-Appellee
    THE PARSONS CORPORATION

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This document complies with the word limit of FRAP 32(a)(7)(B)(i) because, excluding the parts of the document exempted by FRAP 32(f) and FRAP 32(g), this document contains 12,397 words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the  type-style requirements of FRAP 32(a)(6).

/s/*Derek M. Mayor*
Counsel for Defendant-Appellee
The Parsons Corporation d/b/a Parsons
Infrastructure & Technology

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF filing system, which will send notification of such filing to all counsel of record.

/s/ *Derek M. Mayor*
Counsel for Defendant-Appellee
The Parsons Corporation d/b/a Parsons
Infrastructure & Technology